UNITED STATES of America, Appellee,

v.

Fausto D. RUIZ, Defendant, Appellant.

No. 89–1815.

United States Court of Appeals, First Circuit.

Heard April 4, 1990.

Decided June 5, 1990.

500

John C. McBride, with whom McBride, Wheeler & Widegren, Boston, Mass., was on brief, for appellant.

Michael Kendall, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for the U.S.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

Defendant-appellant Fausto D. Ruiz appeals his conviction and sentence on racketeering and drug trafficking charges,[1] hawking a gusher of reasons for reversal. Finding a dry hole, we affirm.

## I.  BACKGROUND

We set forth the evidence in the light most flattering to the prosecution, as the law and the present posture of the case demand. *See, e.g., United States v. Ingraham,* 832 F.2d 229, 230 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

Ruiz was a patrolman in the Lawrence, Massachusetts police department (LPD) during the period 1980–88. His codefendant, Daniel Fillipon, frequently served as his partner.[2] Ruiz, and to a lesser extent Fillipon, obtained gram-sized quantities of cocaine from Lazaro Fernandez, Victor Graciano, Olegario Marte, Jose Rodriguez and their confederates (including Miguel Abreu, Vincente Paulino, and Neo Marte). In return, the officers allowed the drug traffickers to ply their nefarious trade unmolested and provided them with confidential police information and services.

The evidence clearly established that Ruiz, by virtue of his LPD affiliation, was

---

1. After a two week trial, a jury found Ruiz guilty of seven of the original ten counts: racketeering and racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), (d) (counts 1 & 2); conspiracy to distribute cocaine, 21 U.S.C. § 846 (count 6); aiding and abetting the distribution of cocaine, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2 (counts 7–10). Ruiz was acquitted with regard to a second cocaine conspiracy (count 5). The jury failed to achieve unanimity on two charges of extortion in violation of 18 U.S.C. § 1951 (counts 3 and 4).

2. Early in their joint trial, all vestiges of partnership disappeared. Fillipon pled guilty to one charge of conspiracy to distribute cocaine (count 6) and one charge of aiding and abetting cocaine distribution (count 9). He thereupon became the government's star witness against appellant.

useful to the cocaine dealers in various ways. We offer three representative samples of the available proof and a catchall containing an assortment of other items.

1. *Registry · Data.* Employing the LPD's connections with the state Registry of Motor Vehicles (RMV) to the behoof of Graciano and Paulino, Ruiz determined that a particular individual (Cepero) was likely an undercover narcotics agent. He also obtained information from the RMV for Fernandez and received personal use quantities of cocaine (PUQs) in return.[3] Two witnesses testified that the general public did not have access to RMV information of the sort which appellant procured for his criminal confederates.

2. *The Search Warrant Tip.* Through confidential information available within the LPD, Ruiz learned of an impending raid on Neo Marte's apartment. Alerted by appellant, Marte departed the premises hastily, removing a large quantity of narcotics. When the police executed the search warrant, they found that their pigeon had flown the coop. No contraband remained. Marte gave Ruiz three and one-half grams of cocaine in exchange for the tip.

3. *Escort Services.* On one occasion, Ruiz and Fillipon used a marked police cruiser to escort a dealer who was delivering what Ruiz had described as a "large amount" of cocaine. Ruiz also told Fillipon about a time when he accompanied a dealer to New York, obtained a kilogram of cocaine, and brought it back to Lawrence.

4. *Potpourri.* Ruiz furnished Fernandez, Paulino and Abreu with ammunition from LPD stock; warned them of outstanding arrest warrants; drove Graciano to

pick up cocaine and then to meet a customer; and informed his associates of a secret departmental decision to step up narcotics enforcement.

Just as Ruiz's labors on behalf of his criminal comrades were integrated with his police work, so too the rewards of Ruiz's complicity were intermixed with his law enforcement role. For example, Ruiz picked up and used cocaine while on duty, in uniform and carrying a handgun. On several occasions, dealers delivered cocaine to him within a marked police cruiser or inside LPD headquarters.

Notwithstanding this sordid backdrop, appellant mounts several arguments for relief. We have carefully considered the entire asseverational array. Save only for two broad topics, discussed *infra,* we reject his contentions without extended comment.[4]

## II. EVIDENTIARY SUFFICIENCY

Ruiz appeals the district court's denial of his motion for judgment of acquittal on counts 1, 2 and 6, maintaining that "the evidence is insufficient to sustain a conviction of such ... offenses." Fed.R.Crim.P. 29. In this context, a reviewing court is obliged to assess "the evidence in its totality, taken in the light most flattering to the government, together with all legitimate inferences to be drawn therefrom, in an effort to ascertain whether a rational trier of the facts could have found the appellant guilty beyond any reasonable doubt." *United States v. Tierney,* 760 F.2d 382, 384 (1st Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *see also United States v. Boylan,* 898 F.2d 230, 238

---

**3.** At first, Fernandez shaded the truth when asking Ruiz for information. On the fourth or fifth occasion, however, he abandoned all pretext. Fully apprised of the real reason behind the repeated requests, Ruiz continued to do Fernandez's bidding, thereby facilitating felonious activity.

**4.** Among other things, Ruiz protests the admission of certain coconspirator testimony. To a large extent, the protest is procedurally defaulted because appellant failed to lodge seasonable objections below. *See, e.g., United States v. Cintolo,* 818 F.2d 980, 999 (1st Cir.), *cert. denied,*

484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); *see also* Fed.R.Evid. 103(a)(1). In any event, perscrutation of the record convinces us that, wholly apart from waiver, the district court's rulings in respect to the challenged evidence complied with the relevant precedents. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 180–81, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987); *United States v. Masse,* 816 F.2d 805, 811 (1st Cir.1987); *United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980); *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977). There was no harmful error.

(1st Cir.1990); *United States v. Jimenez–Perez,* 869 F.2d 9, 10 (1st Cir.1989).

### A. *Racketeering and RICO Conspiracy.*

We need not differentiate between the first two counts for purposes of appellant's sufficiency challenge. In this case, there is a considerable overlap. Count 2 is premised on 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise ... affect[ing] interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." To prove such a substantive RICO violation, the prosecution must show (1) conduct (2) of an "enterprise" (3) through a "pattern" (4) of "racketeering activity," which in turn necessitates (5) the commission of two or more predicate crimes. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

On the other hand, Count 1 is premised on 18 U.S.C. § 1962(d), which renders it "unlawful for any person to conspire to violate" certain provisions of RICO, including section 1962(c). To convict for such a RICO conspiracy, the prosecution must prove (1) that a common plan existed (2) to conduct an "enterprise" through a "pattern" of "racketeering activity," that (3) the defendant knowingly joined the venture, and (4) embarked upon, or agreed to carry it out, by committing, or agreeing to the commission of, two or more predicate crimes in connection with his enterprise participation. *See Boylan,* 898 F.2d at 241; *United States v. Torres Lopez,* 851 F.2d 520, 528 (1st Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989); *United States v. Angiulo,* 847 F.2d 956, 964 (1st Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988).

Inasmuch as the conspiracy charge in this case posits the commission of the very racketeering activity which count 2 charges substantively, the proof required to uphold the guilty verdict on Count 1 would perforce suffice to uphold the guilty verdict on Count 2.[5] We concentrate, therefore, on Ruiz's challenge to Count 1.

■ 1. *Applicability.* Ruiz begins by arguing that Congress did not intend RICO to reach the type of conduct which occurred here. The statute, he exhorts, was enacted as an antidote to certain organized crime activities and was never intended to encompass acts such as Ruiz carried out to support his drug habit. The plea is bootless; the Court has explicitly rejected the notion that any such limiting principle constrains RICO's scope. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* —— U.S. ——, 109 S.Ct. 2893, 2905, 106 L.Ed.2d 195 (1989) ("Congress ... chose to enact a more general statute ... not limited in application to organized crime."); *Sedima,* 473 U.S. at 495, 105 S.Ct. at 3284 ("Section 1962 [was directed toward] 'any person'—not just mobsters"). RICO prosecutions need not have an "organized crime" nexus.

■ 2. *Pattern of Racketeering Activity.* Defendant's participation in the LPD is admitted. Moreover, the parties stipulated that the LPD was an "enterprise" the conduct of which affected interstate commerce. Thus, we consider the alleged "pattern of racketeering activity."

Under RICO, proof of a pattern "requires at least two acts of racketeering activity," 18 U.S.C. § 1961(5), commonly described as "predicate acts," "predicate crimes," or simply "predicates." The jury convicted Ruiz on counts 7–10. It cannot be gainsaid that these four convictions, not challenged on appeal, each constituted a predicate act in the basic RICO sense. *See* 18 U.S.C. § 1961(1)(D) (defining "racketeering activity" to include, inter alia, numerous drug offenses). In addition, each time Ruiz accepted cocaine as payment for forbearance (i.e., not arresting a dealer), he violated M.G.L. ch. 268A, § 2(b). Each

---

5. Of course, count 1 requires additional proof (relative to the existence of a conspiracy and Ruiz's joining in it) not needed under count 2. *Compare, e.g., Boylan,* 898 F.2d at 241 (describing elements of a charged RICO conspiracy) *with, e.g., R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1352 (5th Cir.1985) (describing elements of a charged substantive offense).

such violation was itself capable of qualifying as a predicate act. *See* 18 U.S.C. § 1961(1)(A). Ruiz nonetheless asserts that these crimes do not show racketeering activity because the necessary concatenation is lacking between them and the enterprise (the LPD). The assertion will not withstand the most cursory scrutiny.

Ruiz's acquisition of cocaine, and his *quid pro quo* conduct, were inextricably intertwined with his authority and activities as an employee of the LPD. His ability to intimidate dealers with the power of arrest, his access to RMV data and inside information anent warrants, his assistance in transporting cocaine, and his ability to supply ammunition were all made possible through, or facilitated by, his employment. In fine, defendant's illegal activities were clearly helped along by the authority vested in him as a police officer and by the reactions (fear and timorousness in some instances) which a police officer, uniquely, has the ability to engender in others by virtue of his position. The necessary nexus between a racketeering enterprise and predicate crimes can be based on circumstantial as well as direct evidence and can be guided by reasonable inference. In this situation, there was ample room for the jury to find a snug fit between defendant's acts and the enterprise.

Forging a link between appellant's criminality and his participation in the LPD does not end this phase of our inquiry. It is well settled that "something more than proof of two predicate acts is needed to prove that a pattern took shape." *Boylan*, 898 F.2d at 249–50. The "something more" has two principal components: relatedness and continuity. *See Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (it is "continuity plus relationship which combines to produce a pattern") (quoting S.Rep. No. 91–617 (1969)). We think that both components were present in this case.

■ For a prosecution to succeed, the predicate crimes "must be sufficiently related to one another and threaten to be more than an isolated occurrence." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 30 (1st Cir.1987). Relatedness necessitates showing that the predicates "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). In this instance, the various acts which Ruiz performed were closely aligned and had a number of obvious similarities. All were intended to aid his criminal associates. All were intended to "earn" cocaine for his own use, usually in the form of PUQs. The main method of operation—forbearance—was repeated over and over again. Subsidiary methods, e.g., peddling information, furnishing bullets, escorting dealers, were also repeated. The numerosity of the defendant's acts, the drug trafficking involvement of those with whom he dealt, and "the collocation of so many common characteristics," *Boylan*, 898 F.2d at 251, were more than enough to prove the essential relationship.

■ We move next to continuity. To establish a RICO pattern, the racketeering predicates must amount to, or constitute a threat of, continuing criminal activity. *See H.J. Inc.*, 109 S.Ct. at 2900–01; *Boylan*, 898 F.2d at 250; *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445 (1st Cir.1990). Continuity demands a case-by-case approach; it may be demonstrated, for example, by proving "a series of related predicates extending over a substantial period of time," or by proving that "the predicates are a regular way of ... conducting or participating in an ongoing and legitimate RICO 'enterprise,'" or by proving that the predicates form a "closed period of repeated conduct." *H.J. Inc.*, 109 S.Ct. at 2902. In the final analysis, it is temporality which constitutes the core of continuity. *See Boylan*, 898 F.2d at 250; *Fleet Credit*, 893 F.2d at 445–47.

In the case before us, the prosecution cleared this hurdle with consummate ease. Over the course of a six year period, Ruiz regularly received cocaine from traffickers in exchange for protecting them from arrest and supplying them with various types of confidential information and services. The jury could certainly have found that

Ruiz's standard operating procedure was to use his official position to facilitate commission of an extended series of related predicates. The fact that the activity continued for so long fully buttressed the conclusion that Ruiz had set up shop and was engaged in a regular way of doing illicit business under the aegis of the enterprise. Indeed, the very facts which established relatedness were in this case also probative of continuity. *Cf. Boylan*, 898 F.2d at 250 (in practice, proof of continuity often overlaps with proof of relatedness). Continuity was abundantly proven.

■ 3. *RICO Conspiracy.* To establish a RICO conspiracy, of course, more is needed than showing a defendant's participation in racketeering activity: the existence of a conspiratorial scheme, and defendant's entry into it, must likewise be demonstrated. The mainspring of a conspiracy is the existence of a common plan, explicit or implicit, among the conspirators. "The agreement, whether tacit or express, may be proven by circumstantial as well as express evidence." *United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989). The defendant's intent is critical: "In order to prove that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent; intent to agree and intent to commit the substantive offenses." *Id.* In this situation, Ruiz's intent to engage in racketeering activity is beyond further challenge, *see supra* Part II(A)(2). It remains for us to assess, from the totality of the evidence, whether a rational jury could have found beyond reasonable doubt that Ruiz's efforts were knowingly directed toward "the accomplishment of a common goal or overall plan," *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir.1984); and whether the plan included Ruiz's agreement, express or implied, to participate in the LPD's affairs through the commission of a pattern of racketeering activity. *See Boylan*, 898 F.2d at 241–43.

There is no reason to tarry at this juncture. It is not necessary "that all defendants participate in all racketeering acts,

know of the entire conspiratorial sweep, or be acquainted with all other defendants." *Id.* at 242; *see also Angiulo*, 847 F.2d at 969. Fillipon's testimony alone, if credited by the jury, was sufficient to establish the charged conspiracy and defendant's knowing participation in it. The witness' credibility was for the talesmen—not for an appellate court. *See, e.g., Jimenez–Perez*, 869 F.2d at 12; *United States v. Molinares–Charris*, 822 F.2d 1213, 1220 (1st Cir.1987). Furthermore, the circumstantial evidence, including the plausible inferences therefrom, pointed toward a finding that a RICO conspiracy existed and that appellant was at its epicenter.

It is apodictic that a criminal jury is free to select among conflicting constructions of the evidence. As we recently wrote: "The proof need not rule out reasonable alternative hypotheses of innocence so long as the record, *in toto*, viewed favorably to the government, substantiates a finding of guilt." *Boylan*, 898 F.2d at 251. Based on the extensive evidence presented at Ruiz's trial, portions of which we have heretofore summarized, the factfinders were fully enfranchised to conclude that the charged conspiracy existed; that appellant willfully joined in it; and that the gist of the unlawful agreement was to conduct LPD business through a pattern of racketeering activity. The law, as we have said, "is not so struthious as to compel a criminal jury to ignore that which is perfectly obvious." *Ingraham*, 832 F.2d at 240.

For these reasons, then, we deem the evidence adequate to sustain defendant's convictions on counts 1 and 2.

### B. *The Cocaine Conspiracy.*

Appellant's final sufficiency challenge asks whether there was enough evidence to support a finding that he conspired with Paulino and Graciano to distribute cocaine. Appellant effectively concedes that there was a drug-oriented conspiracy between Paulino and Graciano, but claims that any assistance he gave to the cocaine conspiracy was unintentional, ergo, not culpable.

■ In order to prove that Ruiz was part of the cocaine conspiracy, the govern-

ment must show that he intended both to join in the agreement and to violate the drug laws. *See Drougas,* 748 F.2d at 15. As we have already indicated, the conspiratorial agreement need not be explicit so long as its existence can plausibly be inferred from the defendant's words and actions and the interdependence of activities and persons involved. *See United States v. Flaherty,* 668 F.2d 566, 580 (1st Cir. 1981). It is beyond cavil that an individual can be part of a conspiracy to possess and distribute narcotics even though he neither directly participates in interstate trafficking nor knows the exact scope and extent of the collective endeavor. *Rivera–Santiago,* 872 F.2d at 1079.

■ The record in this case supports—indeed, virtually demands—an inference of Ruiz's awareness that Graciano and Paulino were operating a drug ring. Notwithstanding that knowledge, he aided them in a multitude of ways: refraining from making arrests; running a check on an undercover agent's license plate; warning the traffickers of the agent's identity; assisting Graciano in picking up and delivering four and one-half ounces of cocaine on one occasion; supplying Paulino with bullets. He was paid for these services. That his compensation was in PUQs rather than in coin of the realm is a distinction without a difference.

In a nutshell, the defendant's connections with the cocaine conspiracy were so profuse, his likely knowledge so great, and his motivation so transparent, that the jury was entitled to infer that Ruiz appreciated "the essential nature of the plan," *id.* (cita-

tion omitted), and freely determined to associate himself with it. Viewed congenially to the government, the evidence comfortably supports a finding that Ruiz possessed, and acted upon, the requisite conspiratorial intent. The proof was, therefore, sufficient to convict under count 6.

## III. THE SENTENCE

Ruiz was sentenced to twenty years imprisonment on counts 1, 2, 8, 9 and 10 and fifteen years on counts 6 and 7, all sentences to be served concurrently, together with special assessments and a term of supervised release.[6] Fillipon was sentenced to four years imprisonment on each of two counts, to be served concurrently, and given a three year special parole term. On appeal, Ruiz challenges the calculations underbracing his sentence and the district court's failure to essay a downward departure.

### A. *Appellant's Sentence.*

■ The RICO offenses were alleged, and proven, to have continued well into 1988. Certain of the narcotics offenses (counts 6, 7, and 9), however, were complete prior to November 1, 1987 (the effective date of the sentencing guidelines). The district court treated Ruiz's entire case as controlled by the guidelines and both sides acquiesced. Accordingly, we entertain defendant's challenge to the district court's guideline computations in pursuance of 18 U.S.C. § 3742(a)(2), inasmuch as that statute unequivocally applies to defendant's appeal anent counts 1, 2, 8 and 10.[7]

---

6. In the circumstances at bar, the statutory maximum applicable to each of the RICO counts was 20 years in prison. *See* 18 U.S.C. § 1963 (1988). The narcotics offenses were committed at different times and therefore carried different punishments. Count 6 bore a maximum of 15 years. *See* 21 U.S.C. § 846 (1982). The penalty provision applicable to count 7, 21 U.S.C. § 841(b)(1)(A) (1982), provided for a maximum term of imprisonment of 15 years. Under the 1984 anti-drug amendments, the maximum term of imprisonment applicable to count 9 was 20 years. *See* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 502, 98 Stat. 1837. The maximum term applicable to

counts 8 and 10 was life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A) (Supp. V 1987).

7. The presentence investigation report stated that "[s]ince the overall offense conduct extended beyond November 1, 1987, the Sentencing Reform Act of 1984 is applicable." PSI Report at p. 2. Neither the defendant nor the government objected to this conclusion. Because 20-year sentences were properly imposed under the guidelines on counts 1, 2, 8 and 10, *see infra,* and the sentences meted out on the pre-guideline counts (a) were concurrent with the "guideline count" sentences and (b) did not exceed 20 years in any instance, the decision to use the guidelines across the board had no practical

1. *Setting The Stage.* The district court, accepting recommendations contained in the presentence investigation report (PSI Report), calculated the guideline range essentially as follows:

a) The base offense level (BOL) should be 32, since the quantity of cocaine involved was between 5 and 14.9 kilograms. *See* U.S.S.G. § 2D1.1(a)(3) & Drug Quantity Table § 2D1.1(c).

b) Because Ruiz possessed a firearm during commission of the offenses, the BOL should be increased by two levels. *See* U.S.S.G. § 2D1.1(b)(1).

c) Because Ruiz abused the trust placed in him as a police officer and used that position to advance his criminal endeavors, the BOL should be increased by two more levels. *See* U.S.S.G. § 3B1.3.

d) Because Ruiz testified falsely at trial, there should be a final two level increase for obstruction of justice. *See* U.S.S.G. § 3C1.1.

Ruiz's total offense level was, therefore, set at 38. Noting that Ruiz had no prior criminal history, the district court tabulated a guideline range of 235–293 months and sentenced Ruiz to 240 months.[8] *See* U.S.S.G. Ch. 5, Part A; *see generally United States v. Diaz–Villafane,* 874 F.2d 43, 47–48 (1st Cir.) (explaining methodology for calculating guideline range), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

Defendant contests two steps in the computation pavane. We approach his arguments mindful that we must both "accept the findings of fact of the district court unless they are clearly erroneous" and "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *see United States v. Mocciola,* 891 F.2d 13, 17 (1st Cir.1989); *United States v. Paulino,* 887 F.2d 358, 359 (1st Cir.1989).

2. *The Firearm Enhancement.* Ruiz challenges the district court's eleva-

tion of the BOL pursuant to U.S.S.G. § 2D1.1(b)(1) because a firearm was possessed during commission of the drug offense. The Sentencing Commission has advised judges to make the adjustment if a firearm or other dangerous weapon was present during the crime's commission "unless it is clearly improbable that the weapon was connected with the offense." *Id.* (commentary). We, and other courts, have accepted that advice according to its tenor. *See, e.g., Mocciola,* 891 F.2d at 17; *Paulino,* 887 F.2d at 360; *United States v. Otero,* 868 F.2d 1412, 1414 (5th Cir.1989). In this case, Ruiz argues that the connection between weapon and offense was far too tenuous since he lawfully carried the firearm incidental to his vocation as a police officer rather than as a means of facilitating his avocation as a criminal.

We cannot say the district court's finding in this respect was clearly wrong. Mere possession of a firearm can trigger the two level increase; there is no requirement that the gun actually be used in perpetrating the drug crime, or that such use be intended. *See, e.g., United States v. Green,* 889 F.2d 187, 189 (8th Cir.1989) (increase upheld when unloaded handgun discovered in apartment where defendant conducted drug transactions); *United States v. Burke,* 888 F.2d 862, 869 (D.C.Cir.1989) (so long as possession proven, no requirement to prove that defendant would have used weapon to advance commission of drug offense); *Paulino,* 887 F.2d at 360 (same; pistol was in bureau drawer in room where cocaine concealed); *United States v. Restrepo,* 884 F.2d 1294, 1295–96 (9th Cir.1989) (same; automatic pistol hidden in mattress in stash house); *United States v. Holland,* 884 F.2d 354 (8th Cir.) (same; pistol found in briefcase along with drug paraphernalia), *cert. denied,* —— U.S. ——, 110 S.Ct. 552, 107 L.Ed.2d 549 (1989); *United States v. Hewin,* 877 F.2d 3, 5 (5th Cir.1989) (same; pistol in back seat of car carrying marijuana in trunk).

effect. Thus, we assume—but do not decide— the correctness of the court's approach.

**8.** The sentence was, of course, lower on counts 6 and 7 because of the statutory maxima, *see* *supra* note 6. This made no practical difference, however, as all terms of incarceration ran concurrently.

Here, the weapon was closely linked to the very powers and office which appellant used to implement his felonious activities. The knowledge that Ruiz carried a gun quite probably instilled confidence in those who relied upon him for protection in exchange for drugs, and fear in those who dealt with his suppliers. The fact that Ruiz was compelled to carry the gun by virtue of his employment was, of course, to be considered—but that fact alone did not make it "clearly improbable" that the weapon was connected with the drug offenses. *Cf., e.g., Otero*, 868 F.2d at 1415 (enhancement for possession of firearm "not dependent on whether the weapon is carried illegally"). After all, where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous. *See United States v. Jimenez–Otero*, 898 F.2d 813, 814 (1st Cir.1990); *see also Mocciola*, 891 F.2d at 17 (even where defendant had been acquitted on weapons charge, district court's factual finding that connection between gun and drug offense was not "clearly improbable" could be upheld on appeal).

■ 3. *Cocaine Quantity.* Defendant's second bolt takes aim at the lower court's finding that his offenses involved between 5 and 14.9 kilograms of cocaine. We believe that this fulguration sheds more heat than light.

At the sentencing hearing, the court made specific findings with respect to the amount of cocaine involved in Ruiz's offenses.[9] These findings were based upon both trial testimony and the PSI Report. At the sentencing hearing, appellant produced no contrary evidence. Under these circumstances, a sentencing judge may rely on the contents of the PSI Report. *See United States v. Rivera Ramos*, 856 F.2d

420, 424 (1st Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989). He or she may likewise rely on evidence presented at defendant's trial in resolving disputed facts. *See United States v. Wise*, 881 F.2d 970, 973 (11th Cir.1989). Reading the record renders it perfectly apparent that the PSI Report and the trial evidence combined to provide the judge with a sufficient evidentiary basis from which to determine the drug quantities involved in Ruiz's offenses.

No useful purpose would be served by a more exegetic account of the details, by miming the district court's brick-by-brick assembly of a satisfactorily sturdy wall, or by limning alternative scenarios under which the drug quantity range could also be supported. *Cf. United States v. Ruiz–Garcia*, 886 F.2d 474, 477 (1st Cir.1989) (where defendant appeals guideline computation without discernible basis, court of appeals should not "wast[e] overtaxed judicial resources razing castles in the air"). In this situation, "the court's recension of the evidence was plausible [so] we cannot say that its conclusions were unfounded or clearly erroneous." *Jimenez–Otero*, at 815. The BOL, and hence the guideline range, was computed in accordance with law.

## B. *Failure to Depart.*

■ Appellant urges us to rule that, even if the guideline range was accurately determined, the sentencing court erred in failing to depart downward. We begin, and effectively end, our consideration of this point by restating clearly established law in this circuit: absent extraordinary circumstances, a criminal defendant cannot ground an appeal on the district court's discretionary decision not to undertake a

---

**9.** The calculation ran along the following lines: Fernandez and Abreu distributed at least 3 kilograms of cocaine during the period when Ruiz assisted them, and supplied him with PUQs of cocaine on at least 100 occasions, aggregating no less than 75 grams; Ruiz helped Graciano deliver 4½ ounces (127.58 grams) of cocaine, assisted Graciano and Paulino with a one kilogram sale to Cepero, and received PUQs aggregating no less than 75 grams from Graciano;

Neo Marte gave Ruiz 3½ grams of cocaine after the search warrant tip and gave him PUQs aggregating at least 23 grams over time; Rodriguez gave Ruiz cocaine aggregating at least 25 grams over time; and Ruiz assisted in transporting one kilogram from New York to Lawrence. The total weight of these quantities, apart from all other drugs mentioned during the trial or in the PSI Report, exceeded 5.3 kilograms.

downward departure from the sentencing range indicated by the guidelines. *United States v. LaGuardia,* 902 F.2d 1010, 1012–1013 (1st Cir.1990); *Jimenez–Otero,* at 815; *United States v. Pighetti,* 898 F.2d 3, 4–5 (1st Cir.1990); *United States v. Tucker,* 892 F.2d 8, 10 (1st Cir.1989). There is nothing in Ruiz's argument—an argument focusing upon such matters as the district court's disparate treatment of Ruiz and Fillipon at sentencing, Ruiz's cocaine addiction, and "the totality of the circumstances involving Ruiz's use of cocaine with fellow officers and witnesses"—which removes it from the hegemony of the general rule.[10] We therefore dismiss appellant's departure argument on jurisdictional grounds.

█ Although supererogatory in light of the absence of appellate jurisdiction, we note in passing that the argument for downward departure appears lame on its merits. The law does not object to disparity in criminal sentencing, but only to unjustifiable disparity. In this instance, there were very good reasons why the codefendant's sentence was milder. Fillipon pled guilty to, and was sentenced on, two counts, participation in the cocaine conspiracy (count 6) and aiding and abetting the commission of a single substantive narcotics charge (count 9), whereas appellant was found guilty on seven counts, including the same cocaine conspiracy, four trafficking counts, and the RICO charges. The sheer number of counts is of small significance, but the relevant conduct on appellant's part was much more pervasive and far more egregious.[11] In addition, there were aggravating factors, e.g., Ruiz's false trial testimony, *see supra* p. 506, his continued drug use while free on bail, and his lack of discernible remorse (especially as contrasted with Fillipon's plea and ensuing cooperation with the government in Ruiz's prosecution and in another ongoing investigation). Then, too, Fillipon was not sentenced under the guidelines; his participation ended in 1986 and the counts to which he pled exclusively involved conduct antedating November 1, 1987. Because the sentencing guidelines dictated the parameters of Ruiz's sentence but did not apply at all to Fillipon, the sentences cannot usefully be compared. *See United States v. Twomey,* 845 F.2d 1132, 1135 (1st Cir.1988) (requiring comparison of pre-guideline sentences to guideline sentences "would call upon the district court to compare plums with pomegranates").

The other bases for downward departure advanced by defendant, dealing with his drug habit and recreational cocaine usage, are equally jejune. *See, e.g., United States v. Williams,* 891 F.2d 962, 965 (1st Cir. 1989) (defendant's cocaine addiction does not present a valid basis for downward departure); *see also* U.S.S.G. § 5H1.4, (policy statement) ("Drug dependence or alcohol abuse is not a reason for imposing a sentence below the guidelines.").

In sum, the sentences imposed on Ruiz and Fillipon, respectively, were simply not fair congeners. There was no unjustifiably disparate treatment or other mitigating factor necessitating a downward departure. Contrary to the purport of Ruiz's argument, a defendant is not entitled to have his sentence ratcheted down merely because his codefendant received a lesser sentence. *See United States v. Bernal,* 884 F.2d 1518, 1520 (1st Cir.1989); *Gregory v.*

---

**10.** Ruiz nowhere contends that his sentence violated the Eighth Amendment's ban on cruel and unusual punishment. Given the severity of the charges, any such contention would be patently frivolous. *See, e.g., United States v. Gilliard,* 847 F.2d 21, 26–27 (1st Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989); *United States v. Francesco,* 725 F.2d 817, 823 (1st Cir.1984).

**11.** The PSI Report indicated several meaningful differences between the roles and criminal conduct of the codefendants. To cite a few: (1) Fillipon, unlike Ruiz, never gave information or bullets to drug traffickers; (2) Ruiz was involved with many traffickers while Fillipon had a relationship with only two; (3) Ruiz, who spoke fluent Spanish, played a primary role in contacts with Spanish-speaking drug traffickers; (4) Ruiz's criminal conduct continued until his arrest in 1988 whereas Fillipon's involvement ended in 1986. The probation officer concluded that: "Any disparity in their sentences corresponds to the nature, length and extent of their criminal conduct." PSI Report, Addendum, at p. 4. The record appears to bear out that viewpoint.

*United States*, 585 F.2d 548, 550 (1st Cir. 1978); *see also Williams v. Illinois*, 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970) (holding that there is no requirement that persons convicted of the same offense receive identical sentences); *United States v. Del Prado–Montero*, 740 F.2d 113, 115 (1st Cir.) ("a discrepancy between sentences imposed on those who have stood trial and those who have not does not constitute reversible error"), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 441, 83 L.Ed.2d 366 (1984).

## IV. CONCLUSION

The well being dry, we need go no further. On this record, we have every confidence that appellant was fairly tried, justly convicted, and appropriately sentenced.

*Affirmed.*