**UNITED STATES of America, Plaintiff,**

v.

**Richard ARNONE & Susan Middleton, Defendants.**

**No. 95–CR–10276–NG.**

United States District Court,
D. Massachusetts.

July 15, 1997.

---

John H. LaChance, Framingham, MA, for Richard J. Arnone, Sr.

Charles P. McGinty, Federal Defender Office, Boston, MA, for Susan G. Middleton.

Karen Taylor, Russel Jacobson, Donald C. Lockhart, U.S. Dept. of Justice, New England Bank Fraud Task, Boston, MA, for U.S.

### ORDER

GERTNER, District Judge.

On June 27, 1997, the Court sentenced defendants Richard Arnone ("Arnone") and Susan Middleton ("Middleton"). After a twelve day jury trial in May 1996, Arnone and Middleton were convicted of conspiracy and violations of 18 U.S.C. § 215. This memorandum amplifies the findings made on that date, as the basis for the sentences imposed by the Court.

### I. STANDARDS

At sentencing, a trial court may determine facts and make judgments based on the credibility of witnesses. 18 U.S.C. § 3742(e); *United States v. Ruiz,* 905 F.2d 499, 507 (1st Cir.1990). But some restrictions apply to the sentencing court's discretion when a defendant has been convicted at trial. *See United States v. Weston,* 960 F.2d 212, 218 (1st Cir.1992) ("Although an acquittal is not always conclusive on an issue for sentencing purposes due to differing standards of proof, a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.") (citations omitted); *United States v. Rostoff,* 53 F.3d 398, 413 (1st Cir.1995) (holding that government's assertion that criminal activity had involved at least five participants was "ironclad" since the jury had found all five defendants guilty on the conspiracy count). Since Arnone and Middleton were both convicted after a jury trial, I cannot revisit the jury's determination with respect to the elements of the offenses of conviction.

## II. DISCUSSION

### A. Offenses of Conviction

At trial, the defendants were convicted of conspiracy and violating 18 U.S.C. § 215, the bank bribery and gratuity statute. The statute provides that whoever:

(1) *corruptly* gives, offers or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution;

(2) As an officer, director, employee, agent, or attorney of a financial institution, *corruptly* solicits or demands for the benefit of any person, or *corruptly* accepts or agrees to accept anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution . . .

> shall be fined not more than $1,000,000 or three times the value of the thing given, offered, promised, solicited, demanded, accepted, or agreed to be accepted, whichever is greater, or imprisoned not more than thirty years or both, but if the thing given, offered, promised, solicited, demanded, accepted, or agreed to be accepted does not exceed $1,000, shall be fined under this title or imprisoned not more than one year, or both.

### B. Applicable Guideline

The statute references U.S.S.G. § 2B4.1; § 2B4.1 references the statute. By title, the guideline governs "Commercial Bribery and Kickbacks." The application notes to U.S.S.G. § 2B4.1 indicate that it "covers commercial bribery offenses and kickbacks that do not involve officials of federal, state, or local government." The background notes sound the same theme—that the guideline "applies to violations of various federal bribery statutes that do not involve government officials." U.S.S.G. § 2B4.1 provides for a base offense level of eight.

The defendants argue this guideline is inapplicable because their conduct involved rewards and gratuities, rather than bribes. They reason that since a gratuity cannot be considered either a kickback or bribe—since

it does not involve a *quid pro quo* exchange—the guideline by its own terms does not cover the relevant conduct.

Bribes clearly involve a *quid pro quo* exchange. *United States v. Mariano,* 983 F.2d 1150, 1159 (1st Cir.1993). Kickbacks according to the defendants, also require some form of *quid pro quo* exchange. *United States v. V.A.P.,* 852 F.2d 1249, 1255 (10th Cir.1988).

Arnone and Middleton argue there was no such exchange in this case, so U.S.S.G. § 2B4.1 is inapplicable. As an alternative, they argue that U.S.S.G. § 2C1.1, "Loan or Gratuity to a Bank Examiner, or Gratuity for Adjustment of Farm indebtedness, or Procuring Bank Loan, or Discount of Commercial Paper," which carries a base offense level of seven, should control their sentences.

### C. *Jury Instructions*

Plainly, based on the evidence at trial, a reasonable jury could have found that there had been no quid pro quo. A reasonable jury—indeed, the jury sitting on this case—could have also found otherwise.[1]

The defendants' argument is fatally weakened by the Court's jury instructions. The Court instructed the jury on the intent element off the statute—"corruptly"—as follows:

> When an act is done without a bad purpose, when it is done mistakenly, negligently, accidentally, carelessly, or simply for some innocent reason, no criminal penalties are attached. The very same act done with corrupt intent is transformed into criminal conduct. Put otherwise, bribery and rewards, as is described in the statute, entails the notion of an intention or a hope for some quid pro quo, some

---

**1.** The defendants made a substantive motion for a new trial, relying on this same theme, i.e. gratuities versus bribes. The court rejected this position both in motions for direct verdict and in post-trial motions.

**2.** *See United States v. McElroy,* 910 F.2d 1016, 1021 (2d cir.1990) (holding a motive to act corruptly is ordinarily hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another); *United States v. Brunson,* 882 F.2d 151, 154 n. 2 (5th Cir.1989) ("[t]he motive to act corruptly is ordinarily a

influence, some exchange from the other person.

(Transcript 12–107, lines 12–25, 12–108, lines 1–5).

The Court used this language because the "corrupt" intent in § 215 modifies both bribes and rewards. Its importance to the offense is clear. In fact, Congress added the "corrupt" element to make it clear that the bank bribery law did not extend to legitimate business activities. Senator Dennis DeConcini admitted that the earlier bank bribery statute "overreached" since it had not included an "intent element." 132 Cong. Rec. S 8306-01 (daily ed. June 24, 1986). The lack of the intent element had "expos[ed] financial institutions and their customers to prosecutions for inadvertent and unintentional acts." *Id.* And since the only definition of corrupt intent in the statutory context involved a *quid pro quo* aspect, the Court felt obliged to use it to define the intent required for both bribes and gratuities.[2]

The defendants point to other language in the instructions which they claim diminished the *quid pro quo* requirement:

> To prove a violation of the statute, however, the government does not have to establish that Mr. Arnone was motivated by the promise of a specific thing of value when he took the actions he's alleged to have taken or that he would not have taken these actions but for the receipt or expectation of the thing of value. To prove a violation of the statute, the government must demonstrate that the thing of value was given or received in connection with the action he took; that is, that it was a reward.

---

hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another."); 2 E. Devitt, C. Blackmar & K. O'Malley, *Federal Jury Practice and Instructions,* § 26.08 (4th ed.1990) ("[a]n act is done 'corruptly' under this bank bribery statute if it is performed voluntarily and deliberately and performed with the purpose of accomplishing either an unlawful end or result or accomplishing some otherwise lawful end or result by any unlawful method or means.")

(Transcript, 12–109, lines 8–16). In this section, the defendants contend that the Court eliminated the *quid pro quo* element.

I disagree. Despite the language in the second section, the intent element—the mental state required for the defendants' conduct to be labelled criminal—made it clear the jury had to find some exchange, some benefit, some *quid pro quo* for conviction. Had I omitted this language, I would have given no meaning to the word "corruptly" which, in 18 U.S.C. § 215, modifies both bribery and gratuity offenses.

■ Consequently, the jury's verdict of guilt on the conspiracy count and the substantive offenses necessarily establishes that it found the defendants' transactions featured a *quid pro quo* arrangement. As a result, the offenses of conviction can and must be treated as bribery for sentencing purposes and U.S.S.G. § 2B4.1 controls.[3]

### D. *Improper Benefit*

U.S.S.G. § 2B4.1 makes it clear that the sentencing judge is also to consider the greater of the value of the bribe or the improper benefit to be conferred in calculating the sentence. The amount of money involved in the transaction enhances the offense level *according* to the table in U.S.S.G. § 2F1.1. Improper benefit "refers to the value of the action to be taken or effected in return for the bribe."

#### 1. *The Bribe*

The "bribe" consisted of the following: (a) a check for $10,000 from Middleton to Ar-

none; (b) checks totalling $9,000 from Middleton to Arnone; and (c) $5,000 in airline tickets given by Middleton to Arnone.

#### 2. *The Improper Benefit*

The "benefit conferred" by Arnone to Middleton is a more difficult issue. The government contends the sum should be calculated as follows: the $6.87 million First Mutual Bank ("FMB") loan was used to fund the construction of a $9.2 million building—its value based on an *ex ante* appraisal. Subtracting the $6.87 million in principal owed by the borrowers, the government totes a figure of $2.33 million in equity. This calculation would lead to a twelve level enhancement. It concedes that there could be costs which could diminish the amount of equity in the building, but contends those costs are minimal.[4]

■ I do not agree with these calculations. The burden is on the government to prove the amounts with sufficient certainty. *United States v. McAlpine*, 32 F.3d 484, 487 (10th Cir.1994). That burden is especially significant here, given the substantial impact that government's calculations will have on the defendants' liberty. The government has not met its burden.

First, it is clear the government itself is not so sure of the correct amount. At sentencing, it offered the Court two other alternative calculations: (a) loan proceeds received by Middleton for 14 months for development and administration costs—totalling $210,000 and/or (b) the tenant security deposit funds $55,277.10. Choice (a)

---

3. Other guidelines consistently distinguish between gratuity and bribery.
   ● 18 U.S.C. § 201(b) (public official bribery) and 18 U.S.C. § 201(c) (public official gratuity) have separate guidelines. Section 201(b) is punishable by § 2C1.1 (base offense level of ten), while § 201(c) is punishable by § 2C1.2 (base offense level of seven)
   ● 18 U.S.C. § 666(a)(1)(B) and 18 U.S.C. § 666(a)(2) penalize persons who bribe or reward those who are connected with programs that receive federal funds. The corresponding guidelines also distinguish between bribes and gratuities. If a bribe, then U.S.S.G. § 2C1.1 applies (base offense level of ten). If a gratuity, then U.S.S.G. § 2C1.2 applies (base offense level of seven)

● 18 U.S.C. § 1954 involves bribes and kickbacks paid to influence officers of employee benefit plans. violations of § 1954 are governed by U.S.S.G. § 2E5.1. This guideline also distinguishes between bribes and gratuities. If a bribe, the base offense level is ten; if a gratuity, the level is six.
I fail to understand why the commission has not made these distinctions with respect to offenses under 18 U.S.C. § 215.

4. The government also cautions the court against splitting the $2.3 million in half, to acknowledge the fact that Middleton had partners in the real estate venture, and could thus only gain half of the equity in the building.

yields an eight level enhancement. Choice (b) yields a 5 level enhancement. I will address each option in turn.

### a. *The Loan*

The government argues that Arnone lied to the First Mutual Bank's Board of Investment ("BOI") when he presented the Needham Estates loan for approval. After the presentation, the government contends that Arnone then approved a series of favorable modifications, which were never disclosed to the Board.

### (1) *Arnone's Misstatements*

The loan proposal submitted to the BOI contained representations that half of the proposed building space had been sold to the American Cancer Society ("ACS") for $4.2 million. The proposal indicated that there would be a purchase and sale agreement from ACS as well as a cash deposit prior to closing. It was to be secured by a $1 million letter of credit from Middleton's British partners.

These representations were untrue. The evidence showed that at the time, ACS was contemplating a swap: its Commonwealth Avenue offices plus $600,000 for half of the new building.

But it is clear that these altered terms were disclosed to some bank personnel other than Arnone. On May 2, 1988, Middleton wrote to Arnone, asking that the purchase and sale requirement be eliminated. She wanted a letter of intent from ACS to suffice for closing. Barbara Perry ("Perry"), counsel to the bank, received and reviewed these requests. She later participated in drafting the letter of intent with ACS. A May 12, 1988 letter from Needham Estates counsel Douglas Errico to Perry also disclosed the tentative state of negotiations: "The Society is unwilling at this point to submit anything more than a nonbinding expression of intent, the proposed form of which is enclosed herewith for your review. Will this be satisfactory to the Bank?"

On May 26, 1988, Arnone approved these changes; Perry included them in written materials. According to the government, these changes were not submitted to the BOI for its approval and were material enough that

they should have been. The loan closed without any update to the BOI.

These circumstances, the government maintains, place the entire $6.87 million loan into the category of an "improper benefit" to be used in the Court's sentencing calculations.

I am unpersuaded. At trial, the evidence was not at all clear that the loan would not have been approved even if the bank had been informed about these changes. The testimony described the frenzy of the time, the extent to which the bank sought development projects like Middleton's. This was especially true here, since Middleton's proposal was to take over a preexisting and entirely non-performing debt for the bank. That fact was the linchpin of the loan's approval; not necessarily the representations of ACS or Middleton's partners. The development itself was in a prized and valuable area; the property would be transformed from a dysfunctional racquetball court into a brand new office building in a desirable location. There was every reason to expect, given the climate, that it would be successful. Finally, there was even some question as to whether the loan changes were brought before the BOT; at least one witness could not be so certain.

■ Arnone's misstatements, then, were not the "but for" cause of the loan's approval. Other factors played into the bank's decision to extend the funds.

### (2) *The Economic Realities of the Transactions*

In computing the "improper benefit to be conferred," I am not bound by either the face value of the transaction or the parties' characterizations of the values involved. In *United States v. Wester*, 90 F.3d 592 (1st Cir. 1996), the defendant had arranged a $2.3 million bank loan for his former partnership on the understanding that it would relieve him from a personal guaranty he had made on an earlier, $12.4 million loan. *Id.* at 593. As part of the deal, he received the $12.4 million release. The district court added this amount into its sentencing calculations.

The appellate court remanded for resentencing because "neither the parties, nor the probation officer made any attempt to develop the information necessary to estimate reasonably the value of the release." *Id.* at 599. The actual value of the release depended on a variety of factors, including "the likelihood of default and the worth of the collateral securing the loan." *Id.*

It is true that the face value of the loan is not necessarily the value of the improper benefit. But the government is not asking us to use the face value in our calculations. So what is the value of the loan? One example from the current guideline may be instructive:

> ... if a bank officer agreed to the offer of a $25,000 bribe to approve a $250,000 loan under terms for which the applicant would not otherwise qualify, the court, in increasing the offense level, would use the greater of the $25,000 bribe, and the savings in interest over the life of the loan compared with alternative loan terms.

§ 2B4.1 (back'd). This illustrates that the calculations revolve around what the borrower would have received without the officer's improper assistance, a very difficult test given the facts of this case.

In *United States v. Fitzhugh,* 78 F.3d 1326 (8th Cir.1996) (cited with approval in Wester), the court considered a similar situation. The defendant-attorney formed sham corporations and misrepresented the financial affairs of the corporations in an effort to obtain Small Business Administration loans. The district court calculated the improper benefit to be $137,500, the amount of a loan from one of the sham corporations to a client of the defendant. *Id.* at 1330. This resulted in an increase of six levels.

The appeals court remanded for resentencing. It noted explicitly that "[t]he value of a transaction is often quite different than the face amount of that transaction." *Id.* at 1331. Specifically, in the case of a loan, "the value of a loan to the borrower will often be less than the face amount of the loan. When a loan is obtained by bribes, it is likely to be at favorable terms, in which case its value will typically be the difference between actual cost of the loan, and the cost of the

same loan at fair market terms and conditions." *Id.* The court conceded that the improper benefit could equal the face amount of the loan "if the borrower's promise to repay were worthless or unenforceable" or "if the borrower, while able to and intending to repay, could not have obtained the loan at any price absent the bribe." *Id.* at n. 2.

█ I am persuaded, as a result of the testimony and evidence at trial, that the $6.87 million loan is not a proper element of the improper benefit computation.

### (3) *A Benefit to the Bank*

First, the loan—with or without any favorable modifications—clearly represented a real benefit for the bank. It was a chance for FMB to remove a $1.2 million bad debt from its books, which had previously been extended on the property. At trial, Peter Conrad ("Conrad"), a financial consultant at the bank, testified that the non-performing loan on the property created an incentive for the bank to make Middleton's loan. (Transcript 11–43, 11–44, lines 25–25, 1–2). Moreover, under the terms of the loan, the property would be transformed into a brand new office building.

### (4) *A Heated Real Estate Market*

Second, at the time FMB extended the loan to Middleton and her partners, the Massachusetts real estate market was booming. Conrad characterized the real estate lending environment in the 1980's in Massachusetts as "very competitive" and "frenzied." (Transcript 11–18, lines 1–7). As a clerk to the BOI, Conrad said that the Board's approval discussions centered mainly on the "asset itself," rather than the mechanics of the financing. (Transcript 11–44, lines 16–23). Central to the Board's consideration of the Middleton proposal was the fact that the property was located just off of Route 128, a location well suited for commercial development.

### (5) *A Possible Deal with ACS*

Finally, a deal with ACS was not a complete illusion. Francis Coolidge, an ACS official, testified that ACS was actively in negotiations for the Gould Street property

throughout the spring of 1988. The loan did close without the ACS lease, but negotiations between the building representatives and ACS had broken down when Middleton's British partners increased the price and sought changes in lease conditions.

### 3. *Loan Advances*

The government also contends that monies received by Middleton as part of the project administration and development costs count as part of the "improper benefit to be conferred."

The initial disbursement of the loan was $2 million; it consisted of the following:

> $93,050.00: closing fee for FMB
> $1,175,641.37: payoff on bad loan to FMB
> $599,647.60: monies to Needham Estates

The $4,000,000 remainder of the loan was to be for the construction of the office building. Every month, Middleton was to request a requisition for additional cash from the bank to be disbursed along with receipts and invoices. Some requisitions were for hard costs (cement, steel) and others were for soft costs (architect fees, design costs). Peter Malacaria ("Malacaria"), an FMB loan official, testified that Middleton provided bills for some soft costs, but she did not do so for "project administration and development costs." An inspector from the bank would confirm whether hard and soft costs had been incurred, but no one ever confirmed the project administration or development costs.

In its memorandum, the government argues for the inclusions of these funds on the grounds that Middleton received roughly $15,000 a month for fourteen months in soft costs from the loan proceeds, used in large part to fund her lavish lifestyle. But Malacaria testified that some receipts and invoices were *provided* for soft costs, so *not* all of the $210,000 went to improper expenses. (Transcript 4–140, lines 14–17).

Moreover, Middleton, as a project manager, may have been entitled to at least some of these funds. Malacaria testified that one

soft cost is a development fee; typically, this fee is the amount of money designated for the borrower's work on the project. (Transcript, 5–85, lines 20–22). Generally, this fee is distributed in a percentage every month, and the borrower does not have to provide a specific detailed accounting. The fee goes to the developer to do what they want with it, "without limitations." (Transcript 6–87, lines 23–24). Middleton was the developer for the Gould Street property. (Transcript 6–64, line 11).

As a result, the government cannot fairly ascertain what portion of these proceeds represented an improper benefit; indeed, it admitted as much at sentencing.

### 4. *Conclusion*

I find that the loan, in its entirety, was not an improper benefit. Moreover, the impropriety of extending the loan to Middleton and the impropriety of monies distributed to Middleton are too difficult to quantify.[5] It is the government's burden to establish the amount of the improper benefit, and it has not done so here. As a result, I will use the value of the bribe in my calculations.

### E. *The Tenant Deposits*

The government claims that because the bank was the mortgagee in possession of the Gould Street property, it had the right to control the security deposits and construction funds held by Needham Estates in its FMB accounts. The government concludes that Arnone verbally released the bank's interest in these funds, thereby allowing Middleton to come into possession of them.

Neither the bank nor Arnone had a right to possession of, or control over, the disposition of these funds. The bank did not own the security deposits. Owners of commercial rental properties are not, like their residential counterparts, subject to the strict requirements of Mass. Gen. Laws ch. 186, § 15B, relative to the maintenance and control of tenant security deposits. *Shwachman v. Khoroshansky*, 15 Mass.App.Ct. 1002, 448

---

5. There is support in the guideline for this analysis. As an example from the U.S.S.G. § 2B4.1 background explains, "If a gambler paid a player $5,000 to shave points in a nationally televised basketball game, the value of the action to the gambler would be the amount that he and his confederates won or stood to gain. If that amount could not be estimated, the amount of the bribe would be used to determine the appropriate increase in offense level."

N.E.2d 409 (1983). According to the testimony of Peter Elliot ("Elliot") and Barbara Perry, it was common for commercial landlords to take and use tenant security deposits and funds in the construction and operation of the project.

Pursuant to the terms of its Mortgage and Security agreement with Needham Estates, FMB expressly relinquished any claims to the deposits. Even the conditional assignment of rents which authorized FMB, upon default, to collect and apply rents to refund security deposits to tenants, anticipated the use of the funds by Needham Estates. The loan documents provided that security deposits were to be deposited in an escrow account at the bank, but did not place any restrictions on the withdrawal of funds from that account.

The bank was neither a co-signatory on the account nor given any special power over the account. The signatories on the account were the principals of the mortgagor's management company and a principal of the mortgagor, i.e., Middleton. Only one signature was required for withdrawal.

This did not change even after the loan entered default in December 1989 and FMB began to receive the tenant rents. But the bank's actions did not place it in actual possession so as to entitle it to step into the shoes of the mortgagor; the property was still run by Elliot for Needham Estates. *In re Prichard Plaza Associates Limited Partnership*, 84 B.R. 289, 297 (Bankr.D.Mass. 1988).

The release of the funds proceeded as follows: Around the beginning of February 1990, Middleton, in France, faxed a request to the Needham Estates property agent, Elliot, asking that the funds be released. Elliot's representative, Paul Minkin, then contacted Arnone on his own, as did Elliot Ravech, ("Ravech") another agent for Needham Estates. Ravech asked Arnone whether the funds should be released; Arnone replied, "release the funds for Needham Estates. They're your [Minkin's] client." (Transcript, 9–19, lines 18–20). It is not at all clear that Middleton *needed* Arnone's permission to authorize the release of the funds. Arnone's response reflected this ambiguity; I find that rather than constituting a release, it reflected his belief that the bank did not control the funds.

The government argues that given the state of the loan at this time the request and/or withdrawal of the deposits—without Arnone's intercession would have generated scrutiny and attention Middleton did not want. The loan was obviously in serious trouble at this point; it had entered default in December 1989. But this argument only relates to the potential aftermath of a release of the funds, not whether Middleton had the authority to release the funds.

The real benefit Middleton received as a result of Arnone's intervention was speed. She was in France at the time; she needed someone to intercede on her behalf to obtain the deposits. Had she been in Massachusetts, she could have simply taken funds out the account on which she was a signatory. In essence, then, Arnone saved Middleton the price of a plane ticket from Paris to Boston.

■ Consequently, I also do not view the tenant funds as part of the improper benefit to be conferred.

### F. *Calculations*

The Court then begins with U.S.S.G. § 2B4.1, which carries a base offense level of eight. The value of the bribe is $24,000 ($10,000 + $9,000 + $5,000), which yields a four level enhancement. A two level enhancement is added to Arnone's sentence for an abuse of trust, yielding a level fourteen. Middleton's sentence is then at a base level of twelve.

Neither individual has a criminal record; each is a criminal history of I. While both defendants have eschewed any request for a departure under *United States v. Grandmaison*, 77 F.3d 555 (1st Cir.1996), the backgrounds of the defendants can inform the specific sentence within the guideline range.

Middleton, fresh from an unpleasant divorce and with absolutely no experience in business, plainly got involved in a transaction that was over her head. She was detained for a period of time, under particularly onerous conditions. While on release, Middleton obtained a job as a courier.

Arnone, though a bank officer, was a relatively new one. The real estate market at

the time was heated, and Arnone was also somewhat overwhelmed by the transaction. He too has worked while on release, as a comptroller.

After reviewing the presentence reports, the letters from friends and family, and the sentencing memoranda of counsel, I believe that the following sentences are fair to the individuals and appropriate punishment for their offenses.

I sentenced Middleton to five months in jail with a recommendation that it be served in a halfway house, to be followed by three years supervised release, with a special condition that the first five months be served under home detention with electronic monitoring. All the statutory conditions apply to the supervised release, and Middleton must pay a special assessment of $350.00 and a fine of $10,000.

I sentenced Arnone to serve fifteen months incarceration and three years supervised release with the statutory conditions. He must also pay a special assessment of $350.00 and a fine of $10,000.

SO ORDERED.

