**UNITED STATES of America, Appellee,**

v.

**John IGUARAN–PALMAR,
Defendant, Appellant.**

No. 89–2143.

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1990.

Decided Feb. 4, 1991.

Carlos R. Noriega, Hato Rey, P.R., for defendant, appellant.

José A. Quiles, Asst. U.S. Atty., with whom Daniel F. López–Romo, U.S. Atty., Hato Rey, P.R., was on brief for appellee.

Before CAMPBELL, TORRUELLA and CYR, Circuit Judges.

TORRUELLA, Circuit Judge.

Appellant John Iguaran–Palmar claims that the district judge mischaracterized his role in the offense and consequently sentenced him to a term of imprisonment which was exceedingly harsh. Finding that the sentence imposed properly reflects the seriousness of his involvement in the drug trade, we affirm.

## I. FACTUAL BACKGROUND

On November 14, 1987, D.E.A. Task Force agent José A. Morales received a telephone call from appellant John Iguaran–Palmar for the purpose of arranging a drug transaction. The deal had been set up by Rubén Alarcón, a drug trafficker in Columbia whom Morales had met through the course of his undercover work and who had advised Morales that he had a man in Puerto Rico who could supply Morales with multi-kilogram quantities of cocaine. Iguaran told Morales to meet him the following Monday, November 16, at 3:00 p.m. at a shopping center in Isla Verde, Puerto Rico, where he would deliver fourteen kilograms of cocaine at a price of $13,000 per kilogram.

The deal proceeded as planned, but a dispute arose over the price to be paid for the cocaine. Iguaran now wanted $14,500 per kilogram, and Morales ultimately agreed pursuant to appellant's promise that over the course of the next two weeks he would deliver over one hundred additional kilograms of cocaine at a price of $14,000 per kilogram. It was further agreed that the money for the fourteen-kilogram deal would be paid the following Wednesday when the next delivery was to take place. Later that afternoon appellant contacted Morales to inform him that the owner of the cocaine had been upset over the fact that the transaction was carried on credit and had demanded that the money be paid right away. Morales indicated to him that he would pay his debt within the next couple of days.

On Tuesday, November 17, appellant once again contacted Morales and a lunch meeting was arranged. Over lunch, it was agreed that Iguaran would make an additional twenty-kilogram delivery that same night, but that the $203,000 owed from the previous transaction would also have to be paid at that time. After lunch, surveillance personnel followed Iguaran to a nearby condominium, where he boarded a vehicle driven by Orlando Pereira–Rivera (a co-defendant in this case), and then drove to an area hotel. From the hotel bar, Iguaran placed a number of calls to Morales and informed him of the time and the place that night's delivery would take place. Iguaran once again insisted that the $203,000 had to be paid before any further transactions could take place. Surveillance agents next observed the suspects leave the hotel and return to the condominium, then place several additional calls to Morales from a curbside public phone. Iguaran, noticeably irate, repeated his request for the money owed, told the agent for the first time that his contacts in Colombia had informed him that if anything went wrong his family was at risk, and insisted that agent Morales reveal his home address so that they could complete the transaction without further delays. His enraged state made Morales realize that it would be impossible for the agents to take possession of the additional

drugs and, after briefly discussing the situation with the D.E.A. agent in charge of the surveillance team, Morales gave the order for the suspects' arrests.

## II. THE PROCEEDINGS BELOW

On December 9, 1987, a federal grand jury returned a four-count indictment charging Iguaran with possessing and conspiring to possess with intent to distribute 13.85 kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and with two counts of unlawfully and intentionally using a communications facility in order to advance the commission of these crimes in violation of 21 U.S.C. § 841(b). On April 18, 1988, appellant pled guilty to the first two counts and, as a result of his plea agreement, counts three and four of the indictment were dismissed.

The sentencing hearing was held on November 3, 1989. Because of the quantity of the cocaine involved, the district judge determined the applicable base offense level to be 32. United States Sentencing Commission, *Guideline Manual,* § 2D1.1 (Nov. 1990) [hereinafter, U.S.S.G.]. Citing appellant's acceptance of responsibility, the court made a two-level downward adjustment. U.S.S.G. § 3E1.1. However, relying on his managerial role in the criminal activity, the court then raised the offense level by three points, U.S.S.G. § 3B1.1(b), arriving at a net base offense level of 33. Appellant was consequently sentenced on each of the charges to concurrent terms of 150 months and to concurrent 5 year terms of supervised release.

## III. DISCUSSION

■ At the outset, a fundamental distinction must be made. The district court relied on the fact that the defendant was found in possession of "unusually pure" cocaine as a basis for his finding that he had played a managerial role in the conspiracy for which he was convicted and that, consequently, an upward adjustment to his base offense level was warranted. In making its determination, the sentencing court relied on Application Note 9 of U.S.S.G. § 2D1.1, which, in relevant part, states:

Trafficking in controlled substances, compounds, or mixtures of unusually

high purity *may warrant an upward departure* ... Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics *may indicate a prominent role in the criminal enterprise* and proximity to the source of the drugs ... (emphasis supplied).

The quoted language, we must emphasize, empowers the district court to consider the purity of the narcotics at sentencing in two different ways. First, the lower court may determine that the drugs' "unusually high purity" denotes proximity to the source and, by implication, a managerial role in the commission of the crime. This circumstance would warrant an *adjustment* to the base level for the offense pursuant to U.S.S.G. § 3B1.1. *See United States v. Fuller,* 897 F.2d 1217, 1220 (1st Cir.1990). Second, the sentencing court may consider the drug's purity in making *an upward departure* from the applicable guideline range once a particular base offense level has been established if the court determines that the narcotics' high level of purity was a circumstance not adequately considered by the Sentencing Commission in formulating the Guidelines and is sufficient to remove the case from the "heartland" demarcated by the Commission for the offense of conviction. *United States v. Sklar,* 920 F.2d 107, 114 (1st Cir.1990). *See also Diaz–Villafañe,* 874 F.2d 43, 51–52 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989) (upholding the district court's reliance on the purity of the drugs to base a departure). The district court's reliance on the cocaine's high level of purity in the instant case is an example of the former situation.

■ The distinction must not be taken lightly, as it is determinative of the standard of review to be employed in either case. If the purity of the cocaine was utilized as proof of the fact that a defendant played a managerial role in the criminal enterprise, then we follow well-established precedents in evaluating a district court's adjustments to the base offense level under the "clearly erroneous" standard of review. *United States v. Wells*

*Metal Finishing, Inc.,* 922 F.2d 54, 57 (1st Cir.1991); *United States v. Medeiros,* 897 F.2d 13, 17 (1st Cir.1990). If, on the other hand, once the district court has arrived at a particular base offense level, it nevertheless elects to depart from the applicable guideline range, our review must proceed along the tri-partite test established in *United States v. Diaz–Villafañe,* 874 F.2d at 49; *see also United States v. Trinidad de la Rosa,* 916 F.2d 27, 29 (1st Cir. 1990). Since the district court determined to adjust defendant's base offense level, rather than depart from the sentencing guideline range, we review the challenged sentence only for clear error.

■■■ Appellant attacks his sentence on two fronts. First, he contends that the district court evaluated his role in the commission of the offense on the basis of unreliable information contained in the Presentence Investigation Report. An examination of the transcript of the sentencing hearing and of the record itself, however, reveals that Iguaran raised no objections concerning the information contained therein. We remind appellant of his responsibility, pursuant to U.S.S.G. § 6A1.1, of responding to the presentence report and identifying the issues that are in dispute. *See also United States v. Zuleta–Alvarez,* 922 F.2d 33, 35–36 (1st Cir.1990) (outlining three-step process for determining what evidence is appropriate for sentencing). In any event, confronted with a similar argument regarding the reliability of the information contained in the presentence report, we have held that the sentencing judge enjoys wide discretion in determining both the relevance and reliability of the sentencing information. *United States v. Tracey,* 675 F.2d 433, 441 (1st Cir.1982); *United States v. Geer,* 923 F.2d 892, 897 (1st Cir. 1991).

■■■ Even had the objection been properly preserved for purposes of this appeal, however, the sentencing court's determination regarding appellant's role in the conspiracy was primarily based on the fact that he was found in possession of 87% pure cocaine. Such a high level of purity, in and of itself, could very well be sufficient to support an adjustment to the defendant's base offense level on the basis of the fact that such proximity to the source of the drugs denotes a managerial role in the commission of the offense. We note, however, that Application Note 9 to U.S. S.G. § 2D1.1 was wisely conceived in discretionary terms. A high purity of narcotics may support an upward departure under the appropriate circumstances, but such a departure will certainly not be warranted in every case. In exercising its discretion to make adjustments, a district court should additionally look to other factors in the record that would provide further support for its determination regarding the defendant's role in the criminal operation and make specific factual findings to that effect. *See United States v. McDowell,* 918 F.2d 1004, 1012 (1st Cir. 1990) (requiring "reasonably specific factual findings" for upward adjustments), *United States v. Wells Metal Finishing, Inc.,* 922 F.2d 54, 58 (1st Cir.1991) (same). In the instant case, the sentencing court additionally observed that another factor also formed part of its decision to adjust the base offense level, *i.e.,* the quantity of the cocaine involved. Although additional specificity would have been desirable, this comment was presumably directed toward the fact that the defendant had professed access to dozens of additional kilograms of cocaine, a fact which the record also clearly supports. These factors are thus clearly sufficient to support an adjustment to appellant's base offense level under U.S.S.G. §§ 2D1.1 & 3B1.1.[1]

Secondly, appellant argues that a fair appraisal of the evidence before the district court reveals that he was, at the very most, a simple "drug courier" in a vast criminal organization. As support for his position he submits that the problems he confronted with his contacts in Colombia as a result of

---

1. We observe briefly that the sentencing court's adjustment of appellant's base offense level by three points was made under subsection (b) (and not subsection (a)) of U.S.S.G. § 3B1.1. Subsection (b) mandates a three level increase "if the defendant was a manager or supervisor, but not an organizer or leader" of the unlawful activity, while subsection (a) requires a four level increase if the defendant effectively acted as an "organizer or leader" of the criminal organization. Thus, the sentencing court properly recognized that there might have been individu-

the fact that he sold the cocaine to the agents "on credit" are indicative of his inexperience and lack of decision-making authority. Similarly, he alleges that his claims of access to additional kilograms of cocaine were just lies in a desperate attempt to entice agent Morales into delivering the money. However, these contentions were also presented to, considered and rejected by the district court, and no clear error appears in its treatment of the matter. While appellant's "on credit" sale could have implied inexperience on his part, it could also have implied that he possessed authority to part with the drugs without receiving payment, and the district court was entitled to choose between these reasonable interpretations of the evidence. *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir.1990). Likewise, appellant's contention that he lied to undercover agents about his capacity to arrange for additional transactions strikes us as nothing more than a self-serving account of the facts, conceived once the reality of his prison future had finally dawned upon him.

Affirmed.

als higher up in appellant's criminal organization, but that his involvement was serious enough to deserve the classification of manager in the illegal enterprise.