UNITED STATES, Appellee,

v.

PILGRIM MARKET CORPORATION,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Arnold B. SUSSMAN, Defendant,
Appellant.

Nos. 91–1581, 91–1582.

United States Court of Appeals,
First Circuit.

Heard July 29, 1991.

Decided Sept. 5, 1991.

Daniel Patrick Leonard with whom Peter Charles Horstmann and Bailey, Fishman & Leonard, Boston, Mass., were on brief, for defendants, appellants.

Stephen A. Higginson, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and HILL,* Senior Circuit Judge.

BOWNES, Senior Circuit Judge.

This is a guidelines sentencing appeal. Defendants-appellants Arnold Sussman and Pilgrim Market Corporation pled guilty to eight counts encompassing selling, storing and transporting adulterated meat and poultry products. The indictment charged violations of 21 U.S.C. §§ 453(g)(3),

458(a)(2), 454(c), and 461(a); 21 U.S.C. §§ 601(m)(3), 610(c), 661(c) and 676(a). The indictment counts against each defendant were identical; defendant Sussman was the owner and treasurer of the Pilgrim Market Corporation, a retail meat and poultry store in Boston.[1]

Defendant Sussman was sentenced to twelve months imprisonment on each of the eight counts, the sentences to be served concurrently. Sussman was also fined $10,000. The court determined Sussman's sentence as follows. It divided the indictment counts into four groups: counts 3, 5, 6 and 7 comprised one group; count 9 alone formed the second group; count 11 was the third group and counts 12 and 13 formed the fourth group. This grouping resulted in a base offense level of 10. The court added two levels for obstruction of justice, gave a two-level downward adjustment for acceptance of responsibility and added two levels for abuse of trust. The total offense level was 12. The criminal history category was 1. These computations brought Sussman within a guideline range of 10 to 16 months imprisonment.

The court fined the corporate defendant $25,000 on each count for an aggregate fine of $200,000. It also levied a special assessment of $200 on each count against the corporation for a total assessment of $1,600.

Sussman appeals the court's grouping of the indictment counts and its enhancement of the sentence for obstruction of justice and abuse of trust.

The corporate defendant appeals the fine levied against it as being excessive and, as such, in violation of the eighth amendment; it also claims that the district court violated 18 U.S.C. § 3572 in its sentencing procedure.

## I. THE GROUPING OF THE INDICTMENT COUNTS

Defendant Sussman argues that all of the counts should have been treated as one

---

* Of the Eleventh Circuit, sitting by designation.

1. Two other corporations and three other individuals were also charged in the indictment with meat and poultry food adulteration violations. They, too, pled guilty and were sentenced at the same time as defendants-appellants.

under U.S.S.G. § 3D1.2. This was the recommendation made by the probation department in the presentence report (PSR). If all the offenses had been grouped as one, the base offense level would have been 6, not 10 as per the district court's grouping.

## A. *Standard of Review*

■ We start with the explicit command of the statute governing review of a sentence:

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

18 U.S.C. § 3742(e).

In *United States v. Cousens,* 942 F.2d 800 (1st Cir.1991), we held: "The determination of whether and how to group counts under the multiple count provisions of the Guidelines more closely resembles an application of the Guidelines to the facts than a finding of fact. Accordingly, we give 'due deference' to the grouping determinations of the district court." at 806. After reviewing the cases in this and other circuits and noting that some other circuits had applied a *de novo* standard of review to groupings of indictment counts we concluded "that we should uphold the district court's groupings even under *de novo* review." at 807. As we noted in *Cousens* the First Circuit cases indicate that the standard of review for grouping is usually clearly erroneous. at 806.

In *United States v. Rosado–Sierra,* 938 F.2d 1 (1st Cir.1991), we held that the clearly erroneous standard applied to the district court's determination of the defendant's role in the offense. at 1, 2. In *United States v. Preakos,* 907 F.2d 7, 8 (1st Cir.1990), we held that the "due deference" language of the statute required that we review the district court's fact-based application of the guidelines only for clear error. *Preakos* did not involve grouping; it was an appeal from sentence enhancement under sections 2D1.1(b)(1) and 3B1.1(a) of the Guidelines. In *United States v. Ruiz,* 905 F.2d 499 (1st Cir.1990), also a sentence enhancement case, we followed the standards of review mandated by the statute: clearly erroneous for the district court's findings of fact and due deference for its application of the guidelines to the facts. *Id.* at 507.

*United States v. Gerante,* 891 F.2d 364 (1st Cir.1989), did involve grouping and we applied the clearly erroneous standard of review. *Id.* at 368. In *United States v. Paulino,* 887 F.2d 358 (1st Cir.1989), a sentence enhancement appeal involving § 2D1.1(b)(1) of the Guidelines, we applied the standards of review set forth in 18 U.S.C. § 3742(e), clearly erroneous and due deference. *Id.* at 359.

In *United States v. Wright,* 873 F.2d 437 (1st Cir.1989), we explored in depth the standard of review for "application of the Guidelines to the particular facts of each case." *Id.* at 443. We noted that mixed questions of law and fact "are often reviewed *de novo,* like pure questions of law." *Id.* We pointed out that "[t]he statute providing for appellate review of sentencing foresees that strict appellate review of Guidelines application questions may not be appropriate." *Id.* We then stated:

Given the Supreme Court authority just mentioned, the word "due deference" in the statute must mean that, in appropriate instances, a court of appeals may review a sentencing court's application of a guideline to the facts in the same way that it reviews a sentencing court's findings of fact, *i.e.,* under the "clearly erroneous" standard. *See* 18 U.S.C. § 3742(d).

*Id.* at 444. We then applied the clearly erroneous standard to the district court's decision that defendant was neither a "minor" or "minimal" participant. *Id.*

To round out our review of first circuit cases we note that at least three "grouping" cases have not expressly articulated a standard of review in upholding the district court. *See United States v. Shmuel David,* 940 F.2d 722, 741–742 (1st Cir.1991);

*United States v. Wheelwright,* 918 F.2d 226, 229–231 (1st Cir.1990); *United States v. Blanco,* 888 F.2d 907 (1st Cir.1989).

Based on the statute and First Circuit precedent we reject a *de novo* standard of review in this case. Central to the district court's decision to group the counts was a finding of fact that defendant's offenses did not constitute a single ongoing plan to sell, store or transport adulterated meat and poultry. Because this was a finding of fact, the statute requires the "clearly erroneous" standard of review. We think that under First Circuit precedent the "due deference mandate" of the statute to the district court's application of the guidelines to the facts translates into a "clearly erroneous" standard of review. This is not a situation where the court has committed pure legal error by misinterpreting the words of the guideline.[2] The question is a mixed question of law and fact: how should the counts to which defendants filed guilty be grouped? This requires an analysis of the criminal conduct of the defendants in light of the guideline provisions.

B. *The District Court's Determination*

Section 3D1.2 of the Guidelines provides:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other ad-

justment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Following this mandate is a list of offenses "to be grouped under this subsection." This is followed by another list of offenses "[s]pecifically excluded from the operation of this subsection." None of the charged counts covered offenses on either list. The district court, therefore, had to follow the next paragraph of § 3D1.2:

For multiple counts of offenses that are not listed, grouping under this subsection may or may not be appropriate; a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level.

Appellant argues that under subsection (b) the district court should have put all the counts into "a single group" because they involved the same victim and were connected by a common criminal objective or constituted part of a common scheme or plan. The district court rejected this approach. It divided the counts into four groups, which we examine in some detail.

Group one was comprised of counts 3, 5, 6 and 7. The indictment charged in pertinent part as to these counts as follows:

Count 3 charged that between January 1, 1989, and February 2, 1989, Pilgrim Market and Sussman sold in commerce poultry products, specifically 360 pounds of fresh, whole turkeys, which were adulterated because the poultry product consisted in

---

**2.** We are aware, of course, that other circuits have used the *de novo* standard in grouping cases. *See United States v. Wessells,* 936 F.2d 165, 168 (4th Cir.1991) (grouping of firearms counts reviewed *de novo* ); *United States v. Riviere,* 924 F.2d 1289, 1303–04 (3rd Cir.1991) (claim that district court should have combined offenses into a single group requires construc-

tion of the guidelines, so review is plenary); *United States v. Ballard,* 919 F.2d 255, 257 (5th Cir.1990) (decision not to group reviewed *de novo* ), *cert. denied,* — U.S. —, 111 S.Ct. 1429, 113 L.Ed.2d 481 (1991). *But see United States v. Gallo,* 927 F.2d 815, 824 (5th Cir.1991) ("due deference" review of district court's determination not to group under § 3D1.2).

whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food.

Count 5 charged that between January 31, 1989, and February 2, 1989, Pilgrim Market and Sussman sold in commerce meat products, specifically 144 pounds of meat franks, which were adulterated because the meat food product consisted in whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food.

Count 6 charged that prior to February 2, 1989, Pilgrim Market and Sussman committed acts which had the effect of causing various meat products, such as pork sausage, smoked liver sausage, sweet Italian sausage, beef hearts and diced pork to become adulterated because the meat food product was held under insanitary conditions whereby it may have become contaminated and consisted in whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food.

Count 7 charged that on or about February 2, 1989, Pilgrim Market and Sussman offered for sale in commerce meat food products, such as pork sausage, smoked liver sausage, sweet Italian sausage, beef hearts and diced pork, which were adulterated because the meat food product was held under insanitary conditions whereby it may have become contaminated and consisted in whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food.

The district court explained that it grouped these counts together because they consisted of a "single composite harm." It found "that these various goods were adulterated or offered for sale on or about the same time to the retailing public generally."

The next group consisted solely of count nine. It charged that on or about February 21, 1989, Pilgrim Market and Sussman transported in commerce meat products, specifically 150 pounds of pork spareribs,

which were adulterated because the meat food product consisted in whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food.

Count 11 alone comprised the third group. It charged that on or about December 28, 1989, Pilgrim Market and Sussman sold in commerce poultry products, specifically approximately 200 pounds of poultry products, which were adulterated because the poultry food product consisted in whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food.

The fourth group consisted of counts 12 and 13. Count 12 charged that on about May 29, 1990, Pilgrim Market and Sussman committed acts which had the effect of causing various meat food products, such as approximately 65 pounds of salt pork and 510 pounds of pork spareribs, to become adulterated because the meat food product was held under insanitary conditions whereby it may have become contaminated and consisted in whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food. Count 13 charged that on or about May 29, 1990, Pilgrim Market and Sussman offered for sale in commerce meat products, specifically bacon and salt pork, which were adulterated because the meat food product was held under insanitary conditions whereby it may have become contaminated and because it consisted in whole and in part of filthy, putrid and decomposed substances and was unsound, unhealthful, unwholesome and otherwise unfit for human food.

The court stated that its "basic rationale" for the second, third and fourth grouping was that "each evidences a separate culpable harm not proven to be part of a single ongoing plan of misconduct and so we have four separate harms."

Sussman argues that § 3D1.2(b) mandates a single grouping because the counts "involve the same victim," the con-

suming public, and "constitut[ed] part of a common scheme or plan." We agree with Sussman that the consuming public was a common victim of his sales of adulterated food products, but that is as far as we go. The court found specifically that the second, third and fourth groups were "not 'proven to be part of a single plan of misconduct.' " It made no such finding for the first group, counts 3, 5, 6 and 7, but its finding that these counts consisted of a "single composite harm" and "were adulterated or offered for sale on or about the same time to the retailing public generally" can only mean that the court found these counts to be part of a common scheme or plan. The question, therefore, is whether the other counts should have been grouped with counts 5, 6 and 7 into a single entity because all counts in the indictment were part of a common scheme or plan.

Applying the due deference standard we have no difficulty in upholding the grouping made by the district court. We turn to the PSR for the facts.

On February 2, 1989, United States Department of Agriculture compliance officers inspected the retail display case of Pilgrim Market. They saw and took photographs of meat and poultry food products which were rodent-infested. "The products were gnawed and chewed and the display case contained rodent fecal matter." When asked by the probation officer about this rodent contamination, Sussman stated that "it was only found in a showcase once and it was only one dropping found on the meat." The photos taken February 2, 1989, showed a variety of meats with rodent gnaw marks and feces on them. Subsequent photos taken on February 6, 1989, showed meats in the display case and the rear storage area with similar rodent gnaw marks and fecal droppings. Photographs taken on May 29, 1990, and February 3, 1991, showed the same type of rodent contamination. In a signed statement dated February 2, 1989, Sussman acknowledged that his meat products contained rodent feces, and that there was evidence that the rodents had eaten through the plastic covers on the meat and into the meat itself.

Unless Sussman had some Pied Piper arrangement we hardly think that selling rodent-contaminated food products could be part of a common scheme or plan.

The only evidence that could be construed as part of a common plan or scheme is Sussman's admission that for two years he had purchased his food product whenever his wholesalers had a deal. The two other corporations and three other individuals charged in the indictment, *supra* n. 1, were food wholesalers. This would explain the sale of sour, rancid and putrid food products by Sussman. There was, however, evidence of contamination from sources other than food bought at a deal. In addition to the rodent infestation, the Department of Agriculture inspectors found food products—whole lamb carcasses—hanging "about 2 [inches] over standing sewerage water which leaked from a pipe."

Finally, the difference in dates between the first group and the other groups negates the finding of a common scheme or plan. The counts in the first group cover offenses between January 1, 1989, and February 12, 1989. The second group has a date of February 21, 1989. The third group's charging date is December 28, 1989. And the fourth group consists of two counts with May 29, 1990, as the charging date on both.

Giving "due deference to the district court's application of the guidelines to the facts," 18 U.S.C. § 3742(e), we cannot say that it erred in finding that Sussman's sale of food products with such disparate sources of contamination and variations in dates of sale was not part of a common scheme or plan. We affirm the district court's determination that § 3D1.2(b) of the Guidelines did not mandate a single grouping of Sussman's offenses.

█ Sussman next argues that the counts should have been treated as a single group under § 3D1.2(d) which provides in pertinent part: "Counts involve substantially the same harm within the meaning of this rule: ... if the offense behavior is ongoing or continuous in nature *and* the

offense guideline is written to cover such behavior." (Emphasis added).

An examination of some of the guidelines for pollution crimes, which under comment 6(7) to § 3D1.2 are to be grouped, sheds light on the meaning of the "and" clause. The guidelines covering offenses involving pollution of the environment specifically take into account ongoing or continuous behavior by providing upward adjustments for repetitious behavior. *See e.g.*, § 2Q1.2(b)(1)(A) (if repetitive release of toxic substance, increase by 6 levels); § 2Q1.3(b)(1)(A) (similar); 2Q1.4(b)(3) (if repetitive release of contaminant into a public water system, increase by two levels). In contrast, the guideline applicable to defendant's offenses, § 2N2.1, simply provides a base offense level of 6. It has no built-in adjustment increasing the offense level for repeated criminal acts. Pollution guidelines specifically provide upward adjustments for repeated behavior while food adulteration ones do not. This explains why grouping is mandatory for pollution offenses but not for food adulteration offenses.

Moreover, defendant's argument for mandatory grouping defies common sense. Under defendant's approach the worse the behavior, the lower the offense level and the lighter the punishment. That is because the more frequently a person sells adulterated food the more his criminal activity appears to be "ongoing and continuous in nature." On the other hand, a food retailer who sold adulterated products twice in a year and passed inspection in the interim could not be deemed to have exhibited behavior that was ongoing and continuous. Under defendant's logic the offenses of the two-time violator would not be grouped, but more frequent violations would be. We refuse to read § 3D1.2(d) so as to confer a benefit upon the frequent violator of the adulterated food laws.

## II. OBSTRUCTION OF JUSTICE

■ The standard of review for an obstruction of justice sentence enhancement is clearly erroneous. *United States v. Wheelwright*, 918 F.2d at 228. The sentencing guideline covering this offense is § 3C1.1 which provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." Comment 3(d) states in pertinent part: "The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies: ... (d) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation...."

Defendant contends that the district court erred in interpreting the guideline because his conduct of obstructing justice did not occur during the investigation or prosecution. Under the facts as set forth in the PSR, which Sussman did not contest, this position is untenable.

The PSR states:

(3) On January 17, 1990, Compliance officer Fleming interviewed Mr. Michael Brown, an employee of Pilgrim Market Corp. Mr. Brown admitted, in part, that the five boxes of various poultry food products, which were found to be unfit for human consumption and voluntarily destroyed on January 3, 1990[,] were not all of the product that was bad. There were also three or four more boxes of this product in the freezer where ["]You could not find them[.]" He further acknowledged that the stickers were removed after which they put them in the retail case and sold to Pilgrim retail customers.

 · · · · ·

(40) According to oral comments made by Michael Brown, former employee of Pilgrim Market ... Sussman instructed him to clean the rodent droppings from the case containing poultry before the U.S. Department of Agriculture would come in for inspection. Mr. Sussman would also instruct Mr. Brown and another employee to put rancid chicken in the back of the freezer and ["]bury them["] by putting cases of liver and

spareribs on top of them when the U.S.D.A. would come in.

(41) Mr. Brown also advised that Mr. Sussman knew that if the U.S.D.A. did not return to the market within a ["]couple of hours["] from their first visit, they would not come back that day and then would instruct his employees to put the rancid meat back in the display cases. Hiding rotten poultry and meat products in the freezer so that Agriculture Department inspectors would not find them and selling them after the danger of detection had passed is a flagrant example of concealing evidence material to an official investigation. There is no factual basis for defendant's claim that there was no obstruction of justice during an official investigation. We affirm the district court's adding two levels for obstruction of justice.

### III. ABUSE OF TRUST

■ Defendant objects to the two-level increase for abuse of trust on the following grounds: that he did not occupy a position of trust; that, if he did occupy a position of trust, he did not abuse this position in a manner that significantly facilitated the commission or concealment of the offense; and that because abuse of trust was a characteristic of the offense an upward adjustment under guideline § 3B1.3 was inappropriate.

These are interesting issues, particularly the third one relative to the characteristic of the offense. The problem is that defendant did not raise them below. The court specifically asked defense counsel if he wanted to be heard on the two-level upward adjustment for abuse of trust. Counsel replied:

> Well, I would like to say this, your Honor. Right along he has asked that he plead, that he will not stand trial, that it's on his mind, that he feels he has been disloyal to customers that he's built up over a period of 40 years. He says some of their children and grandchildren buy stuff from him. All this time he felt one thing, just to get it over with and plead guilty no matter what it was. For example, to the counts of carrying and trans-

porting. That stuff, he didn't know what—you can't tell what it is. You can't open it and examine it. He buys that from an unknown supplier.

> I would simply like to say that I don't understand why he should be the sacrificial lamb here when the source of supply came from the other defendants. He couldn't obtain these goods except through them. He didn't look elsewhere except to those people who are regularly in that business and who supply many, many other shops like his. And that there was no reason why he should be singled out to be the sacrificial lamb.

We read this to mean either that defendant agreed that he had abused his trust or that he was not contesting the PSR recommendation that two levels be added for abuse of trust. Certainly none of the arguments raised before us were even faintly suggested below. Under the circumstances we have no recourse but to find that any challenge to the abuse of trust sentence enhancement was waived. In *United States v. Fox*, 889 F.2d 357 (1st Cir.1989), we stated in words directly applicable here:

> This is a perfect example of the reason for our rule, "that an issue not presented in the district court will not be addressed for the first time on appeal." *United States v. Curzi*, 867 F.2d 36, 44 (1st Cir.1989); *see also United States v. Figueroa*, 818 F.2d 1020, 1025 (1st Cir. 1987); *United States v. Argentine*, 814 F.2d 783, 791 (1st Cir.1987). In light of defendant's failure to object to the factual presentation in the presentence report, the district court had a right to believe that defendant agreed that the facts therein were true and accurate. If the objection now raised had been formulated below there would have been an opportunity for the court to consider it and rule accordingly.

*Id.* at 359. *See also United States v. Visman*, 919 F.2d 1390, 1393–94 (9th Cir.1990).

### IV. THE FINE AGAINST THE CORPORATION

■ The court fined the Pilgrim Market Corporation, which is owned, controlled and

directed by Sussman, $25,000 on each of the eight counts to which it pled guilty. Pilgrim Market attacks the fine of $200,000 on two grounds: that it violated the eighth amendment because it was excessive; and that it violated the pertinent provisions of 18 U.S.C. § 3571.

We note at the outset of our discussion that the sentencing guidelines do not, yet, apply to corporate criminal defendants. We will assume for purposes of our discussion that the eighth amendment proscription against excessive fines applies to corporations, although this is a very tenuous assumption. Simply put, we do not find the fine to be excessive. It is less than half the statutory maximum of $500,000, 18 U.S.C. § 3571(c)(3), and one half of the government's recommendation. We are not impressed with Pilgrim Market's contention that the district court intended to put it out of business. The following colloquy took place between counsel for Pilgrim Market and the court at the sentencing hearing:

THE COURT: All right. We'll take it, then, there are no objections to the factual content [of the PSR], but I will hear you as to what you think an appropriate sentence ought be.

MR. AUERBACH: Well, any amount of money that they could pay out on a probationary period I think should be very, very minimal, not anywhere near as the Court said, which would be quite a hardship to pay out in one gross amount.

THE COURT: Well, you say a hardship, but the company is guilty of repeated felony violations here. Why should they be in business foisting this unfit, unsafe product on the public?

MR. AUERBACH: That has since stopped. Since then they have only bought the best.

THE COURT: Well, why shouldn't they pay the piper then for their past behavior? Certainly Pilgrim has not been a good corporate citizen.

■ A fine, like a sentence of incarceration, serves two purposes: punishment and deterrence to others. We do not think that a fine of $200,000 for repeatedly selling rotten poultry and meat products to the public is excessive punishment. And it would also serve as a significant deterrent to others who might be tempted to follow the same practice. We next consider the alleged statutory violations.

18 U.S.C. § 3572(a) provides:

(a) Factors to be considered.—In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)—

(1) the defendant's income, earning capacity, and financial resources;

(2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution.

(5) the need to deprive the defendant of illegally obtained gains from the offense;

(6) whether the defendant can pass on to consumers or other persons the expense of the fine; and

(7) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

There was no objection to the factual statements in the PSR about Pilgrim Market. These included income statements for the years 1989 and 1990 showing gross receipts of $739,500 in 1989 and $961,651 in 1990. Balance sheets for 1989 and 1990 were also included in the PSR. The record of the sentencing hearing shows that the district court was fully cognizant of the financial condition of the corporation as set forth in the PSR. It specifically inquired

whether "a sentence anywhere near what the government wants [$500,000 fine] is going to put them into bankruptcy?" Counsel for the corporation said that such a sentence would "throw them out of business entirely." We can only assume that the court took this into consideration when it fined the corporation $200,000, not the $500,000 recommended by the government.

Although the district court did not follow the script of 18 U.S.C. § 3572(a), we find that it did consider all the pertinent factors enumerated therein before it determined the amount of the fine to be assessed against the defendant corporation.

The sentences of defendants Sussman and Pilgrim Market Corporation are:

AFFIRMED.