February 8, 1993
UNITED STATES COURT OF APPEALS
For The First Circuit

No. 92-1920

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL J. SAVOIE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, U.S. District Judge]

Before

Breyer, Chief Judge,

Aldrich, Senior Circuit Judge,

and Selya, Circuit Judge.

Robert B. Mann, with whom Mann & Mitchell was on brief, for

appellant.
Edwin J. Gale, First Assistant United States Attorney, with

whom Lincoln C. Almond, United States Attorney, was on brief, for

the United States.

February 8, 1993

SELYA, Circuit Judge. We consider today a golconda of
SELYA, Circuit Judge.

challenges mined by defendant-appellant Paul J. Savoie in a

relentless effort to ameliorate a sentence imposed in the

district court. Concluding, as we do, that appellant is digging

in barren soil, we affirm the judgment below.

I. BACKGROUND

For several years, appellant led a double life. While

serving as a policy adviser to the mayor of Pawtucket, Rhode

Island, he was also part of a trio of high-ranking city officials

who systematically exploited the public trust for personal

profit. The other two members of the tarnished troika were the

mayor, Brian Sarault, see United States v. Sarault, 975 F.2d 17

(1st Cir. 1992), and the acting public works director, Louis

Simon. Because of the extensive range and reach of the

triumvirate's illegal activities, we abjure any attempt to

describe the plot at this juncture. We will, however, refer to

certain relevant outrages in connection with our canvass of

appellant's arguments on appeal.

Savoie eventually pleaded guilty to one count of

racketeering, see 18 U.S.C. 1962(c) (1988), and two counts of

extortion, see 18 U.S.C. 1951 (1988).1 At sentencing, the

district court reviewed the presentence investigation report (PSI

Report), appellant's objections thereto, and transcripts of grand

1The other twenty-seven counts in the indictment, including
numerous charges of attempted extortion, conspiracy to commit
extortion, and receiving bribes, were dismissed by agreement at
the time of sentencing.

2

jury testimony furnished by the government. Appellant chose to

present no independent evidence (although he did rely on his

description of the offense as related to the probation officer

and incorporated in the PSI Report).

For the most part, the district court adopted the PSI

Report's suggested findings. The court calculated the guideline

sentencing range (GSR) at 41-51 months (offense level 22/criminal

history category I) and imposed an incarcerative sentence at the

top of the range. The court also imposed a three-year term of

supervised release, a $7,500 fine, a $150 special felony

assessment, and 150 hours of community service. Finally, the

court ordered Savoie to make restitution in the sum of

$93,476.67. This appeal followed.

II. DISCUSSION

We have grouped appellant's myriad complaints under

four headings. We discuss them sequentially.

A. The Role-in-the-Offense Adjustment.

The sentencing guidelines mandate a three-level upward

adjustment if "the defendant was a manager or supervisor . . .

and the criminal activity involved five or more participants or

was otherwise extensive." U.S.S.G. 3B1.1(b) (Nov. 1991).

Appellant claims that the district court erred in relying on this

proviso. In this case, the criminal activity was extensive

enough to satisfy the guideline. The only cognizable question,

then, is whether the sentencing court erred in determining that

appellant was a manager or supervisor of the ring. Where, as

3

here, the sentencing court's decision to apply a role-in-the-

offense adjustment is factbound, we review the determination only

for clear error. See United States v. Dietz, 950 F.2d 50, 52

(1st Cir. 1991); United States v. Diaz-Villafane, 874 F.2d 43, 48

(1st Cir.), cert. denied, 493 U.S. 862 (1989).

In making a role-in-the-offense determination, the

sentencing court need not wear blinders but may look beyond the

count of conviction to the whole of the defendant's relevant

conduct. See United States v. Ruiz-Batista, 956 F.2d 351, 353

(1st Cir.), cert. denied, 113 S. Ct. 105 (1992); see also

U.S.S.G. Ch. 3, Pt.B, intro. comment. Managerial status may

attach if there is evidence that a defendant, in committing the

crime, exercised control over, or was otherwise responsible for

overseeing the activities of, at least one other person. See,

e.g., United States v. Veilleux, 949 F.2d 522, 524 (1st Cir.

1991); United States v. Akitoye, 923 F.2d 221, 227 (1st Cir.

1991); United States v. Fuller, 897 F.2d 1217, 1220-21 (1st Cir.

1990). The evidence of such control need not be direct. See

Diaz-Villafane, 874 F.2d at 48 (observing that felons are

"unlikely to make much use of position descriptions or

organizational charts"). Where numerous participants are

involved, or the criminal activity is otherwise extensive, the

court must often make hierarchical distinctions between those at

the very top of the criminal enterprise (the organizers or

leaders) and those who, while in positions of executive

authority, are lower on the totem pole (the managers or

4

supervisors). In making such fine distinctions, the indicia of

executive status include such things as the defendant's role in

recruiting accomplices, the degree and nature of the defendant's

participation in planning and implementing the offense, the

defendant's exercise of decisionmaking authority, and the

defendant's level of remuneration relative to other participants

(including the presence or absence of a claimed right to a share

of the crime's fruits). See U.S.S.G. 3B1.1, comment. (n.3);

see also United States v. Sostre, 967 F.2d 728, 733 (1st Cir.

1992); United States v. Panet-Collazo, 960 F.2d 256, 261 (1st

Cir.), cert. denied, 113 S. Ct. 220 (1992).

Here, the record is fairly bursting at the seams with

evidence buttressing the inference of managerial status. In

addition to extorting funds himself, appellant used internuncios

(e.g., Joseph Stifano, Robert Langlois) as conduits for obtaining

bribes;2 manipulated Pawtucket's highway director (Ron Lieto) in

order to extract free services for himself from a contractor

doing business with the City; gave occasional directions to his

fellow triumvir, Louis Simon; and, in general, as the district

judge aptly put it, "made some rather significant decisions,

including the decision of how much [would be demanded] and from

whom [it would be extorted]."

We are completely unmoved by appellant's plea that he

2The RICO count to which appellant pleaded described twenty-
four separate racketeering acts. Act No. 17, described infra

note 6, is an excellent example of how appellant used go-
betweens.

5

was merely a footsoldier in Mayor Sarault's iniquitous army. A

defendant need not be the highest ranking member of a criminal

troupe in order to be a manager or supervisor. Indeed, the

applicable guideline provision stresses that managerial role

adjustments, as opposed to other upward role-in-the-offense

adjustments, apply to defendants who were managers or

supervisors, but not organizers or leaders. See U.S.S.G.

3B1.1(b). In other words, Sarault's acknowledged status as the

commander-in-chief is not in any sense inconsistent with the

court's finding that appellant was his lieutenant. See, e.g.,

United States v. Iguaran-Palmar, 926 F.2d 7, 10 n.1 (1st Cir.

1991).

We will not paint the lily. Appellant was a prime

mover in a pervasive pattern of municipal corruption lasting for

several years. He gave orders, participated in setting policy,

made decisions, and shared handsomely in the booty. The evidence

here is more than sufficient to ground the district court's

finding that appellant served the ring in a managerial capacity.

See United States v. St. Cyr, 977 F.2d 698, 706 (1st Cir. 1992)

(holding that "when there are two plausible views of the record,

the sentencing court's adoption of one such view cannot be

clearly erroneous"); Diaz-Villafane, 874 F.2d at 49 (similar;

discussing role-in-the-offense adjustments).

B. The Restitution Order.

As part of the Victim and Witness Protection Act of

1982 (VWPA), Congress authorized district courts to order that

6

convicted defendants make restitution to victims. See 18 U.S.C.

3556, 3663, 3664 (1988 & Supp. 1990).3 The federal

sentencing guidelines themselves require such orders in many

circumstances. See U.S.S.G. 5E1.1. In this instance the

district court ordered restitution, directing that appellant

repay, in installments, a total of $93,476.67.4 Appellant

attacks the order on three grounds. He is shooting blanks.

1. The Computation. The VWPA provides that, in
1. The Computation.

determining the size of a restitution order, a court must

consider, among other things, "the amount of the loss sustained

by any victim as a result of the offense." 18 U.S.C. 3664(a).

When this amount is disputed, the government bears the burden of

establishing it by a preponderance of the evidence. See 18

U.S.C. 3664(d). Because a determination of victim loss is

fact-intensive, we review it only for clear error. See United

States v. Teehee, 893 F.2d 271, 273-75 (10th Cir. 1990).

The law cannot be blind to the fact that criminals

rarely keep detailed records of their lawless dealings, totalling

up every column and accounting for every misbegotten dollar.

Hence, the preponderance standard must be applied in a practical,

common-sense way. So long as the basis for reasonable

approximation is at hand, difficulties in achieving exact

3Until November 1, 1986, the last two of these sections were
codified at 18 U.S.C. 3579 & 3580, respectively.

4Of this amount, $89,876.67 represented restitution to the
City of Pawtucket while the remainder represented restitution to
other victims. Savoie does not challenge the latter component of
the restitution order.

7

measurements will not preclude a trial court from ordering

restitution. See United States v. Hand, 863 F.2d 1100, 1104 (3d

Cir. 1988); see also S. Rep. No. 532, 97th Cong., 2d Sess. 31,

reprinted in 1982 U.S.C.C.A.N. 2515, 2537 (explaining that "where

the precise amount owed is difficult to determine, [the VWPA]

authorizes the court to reach an expeditious, reasonable

determination of appropriate restitution by resolving

uncertainties with a view toward achieving fairness to the

victim").

In this case, appellant contends that the restitution

order is invalid because the court's recapitulation of losses to

victims lacks an adequate evidentiary foundation. We disagree.

The racketeering count to which appellant pleaded guilty

enumerated twenty-four racketeering acts. The computation of

victim loss followed this roadmap. The district court

scrutinized transcripts of grand jury testimony designed to

document the aggregate amount of money involved in each episode.

The court then attempted to ascertain how much of the extorted

money appellant pocketed.5

To be sure, reconstructing the tally was not a black-

and-white proposition. There were points at which the guideposts

became blurred and shadings of gray emerged but on the whole,

the available evidence was adequate to the task. In some

instances, there were specific percentages or amounts described

5We take no view on whether, in these circumstances,
restitution was necessarily limited to what appellant himself
pocketed.

8

in the testimony. In other instances, the court's calculation

rested on testimony establishing the coconspirators' general

intent about how the spoils should be divided. In every

instance, the record contained, at a bare minimum, a plausible

basis on which to predicate reasonable estimates or

approximations. No more was exigible.

Given the district court's meticulous, act-by-act

reconstruction of the amounts extorted, and the court's founded

estimates of the sums retained by appellant, we cannot say that

the court erred in compiling the overall loss amount.6

6While a complete catalog of record support for the victim
loss calculation would trespass unduly on the reader's
indulgence, we sketch, by way of representative illustration, the
evidence relating to two racketeering acts.

A. Act No. 15. A vendor testified before the grand
A. Act No. 15.

jury that he paid appellant a ten percent cash kickback on all
sales his company made to the City. The vendor reported gross
sales to the City of $6,043.62 in 1988, $34,313.53 in 1989,
$40,518.91 in 1990, and $27,459.85 in 1991. Because he stopped
making payments after Sarault was arrested in June of 1991, the
vendor estimated that the kickbacks for that year were roughly
equivalent to five percent of annual sales. This evidence,
coupled with the eminently reasonable assumption that the amounts
in question could otherwise have been subtracted from the
inflated prices charged to the City, provides sufficient support
for the district court's $9,460 victim loss calculation. The
record also supports a conclusion that appellant retained one
hundred percent of these kickbacks. The vendor stated that he
paid the money to Savoie, and other testimony indicates, unlike
in other instances, that neither Sarault nor Simon received a
dime.

B. Act No. 17. Langlois told the grand jury that
B. Act No. 17.

appellant asked him to relay a message to a property owner who
wanted a zoning variance. The message, in brief, was that the
owner's "problem" could be solved if the wheels of government
were lubricated to the tune of $5,000. The owner accepted the
offer, received the variance, and paid the bribe to Langlois.
Langlois then brought the money to appellant. Because one of the
ringleaders told the grand jury that "Paul [Savoie] normally took

9

2. Ability to Pay. In fashioning a restitution order,
2. Ability to Pay.

a sentencing court does not function merely as a type of judicial

abacus, toting up the amount of loss and writing down the

appropriate figure. The court must also "consider . . . the

financial resources of the defendant, the financial needs and

earning ability of the defendant and the defendant's dependents,

and such other factors as the court deems appropriate." 18

U.S.C. 3664(a). Noting that the court below made no specific

findings with regard to these considerations, appellant asserts

that the restitution order must fall. We review this claim of

legal error de novo. See St. Cyr, 977 F.2d at 701.

There has been considerable debate over when, if ever,

the VWPA may require a restitution-ordering court to make

explicit findings concerning a defendant's financial condition.

At least four circuits have held that specific findings are not

required in this general context. See United States v.

Cannizzaro, 871 F.2d 809, 810-12 (9th Cir.), cert. denied, 493

U.S. 895 (1989); United States v. Mahoney, 859 F.2d 47, 49-50

(7th Cir. 1988); United States v. Purther, 823 F.2d 965, 969 (6th

Cir. 1987); United States v. Golomb, 811 F.2d 787, 791 (2d Cir.

1987). Five other circuits, invoking supervisory powers, have

told district courts that specific findings are often needed to

facilitate appellate review. See United States v. Owens, 901

F.2d 1457, 1459-60 (8th Cir. 1990); United States v. Hairston,

from 20 [percent] to a third" of the payoffs for himself, the
district court's finding that appellant received $1,000 from this
act had a sufficient evidentiary predicate.

10

888 F.2d 1349, 1352-53 (11th Cir. 1989); United States v.

Patterson, 837 F.2d 182, 183-84 (5th Cir. 1988); United States

v. Bruchey, 810 F.2d 456, 459 (4th Cir. 1987); United States v.

Palma, 760 F.2d 475, 480 (3d Cir. 1985).7 We have not yet

spoken to this question.

To resolve this appeal, we must take only one small

step along the path. We rule that a district judge need not make

open-court findings on the statutory factors when issuing a

restitution order so long as the record on appeal reveals that

the judge made implicit findings or otherwise adequately evinced

his consideration of those factors. After all, the VWPA itself

demands no more than that the district court "consider" the

factors enumerated therein. 18 U.S.C. 3664(a). The statute

makes no mention of mandatory findings a circumstance that we

believe is consistent with Congress's stated desire not unduly to

complicate or prolong the sentencing process through the VWPA's

restitutionary provisions. See 18 U.S.C. 3663(d). Whatever

may be the rule in a more extreme case a matter on which we do

not opine we believe that the absence of express findings is

not fatal in cases in which the record clearly indicates that the

7The Tenth Circuit has sent mixed signals on this issue.
After initially favoring explicit findings, the court has since
repudiated the need for such findings and stated that a district
judge only need consider the defendant's financial condition.
Compare United States v. Hill, 798 F.2d 402, 406-07 (10th Cir.

1986) (requiring specific findings) with United States v.

Morrison, 938 F.2d 168, 171-72 (10th Cir. 1991) (not requiring

specific findings) and United States v. Rogat, 924 F.2d 983 F.2d

983, 986 (10th Cir.) (same), cert. denied, 111 S. Ct. 1637

(1991).

11

court gave thought to the requisite factors.

Here, we are satisfied that the court below duly

considered the statutory factors. The PSI Report contained a

lengthy discussion of them. The district court explicitly

adopted the PSI Report's findings and, despite the statutory

burden placed upon him, see 18 U.S.C. 3664(d), appellant never

offered evidence suggesting that his financial condition

constituted a barrier to effecting full restitution. Finally,

the information in the record does not suggest that the

restitution order, payable in installments, is beyond appellant's

reach, given his accessible assets and earning capacity. In such

circumstances, there is no basis for assuming that the district

court ignored the statutory mandate by failing to mull

appellant's financial situation.

3. The Civil Settlement. The VWPA provides that
3. The Civil Settlement.

courts "shall not impose restitution with respect to a loss for

which the victim has received or is to receive compensation." 18

U.S.C. 3663(e)(1). On July 24, 1992, three days before he was

sentenced, appellant signed an agreement with the City of

Pawtucket, settling Pawtucket's claims against him for $52,000,

payable over time. Appellant asserts that by negotiating this

settlement he effectively fulfilled (or, at least, set a ceiling

on) his restitutionary obligations vis-a-vis Pawtucket's losses.

We afford plenary review to the web of essentially legal

questions surrounding the settlement agreement's effect. See St.

Cyr, 977 F.2d at 701.

12

At the outset, we remark that the settlement agreement

upon which appellant relies is a particularly poor vehicle for

conferring special treatment: its scope is limited; its language

skirts any admission of responsibility;8 and the promise it

memorializes is, at present, no more than that an executory

promise to pay. No money has yet changed hands and the planned

future payments extend over a protracted period.

Beyond these infirmities, the sockdolager is that the

settlement between Savoie and the City concerns potential civil

liability. But, the sort of restitution imposed below is not a

civil affair; it is a criminal penalty meant to have deterrent

and rehabilitative effects. See Kelly v. Robinson, 479 U.S. 36,

49 & n.10 (1986). Private parties cannot simply agree to waive

the application of a criminal statute. See, e.g., Hairston, 888

F.2d 1153 (holding that a civil settlement did not necessarily

preclude a restitution order under the VWPA because the penal

purpose of that act was not a litigated issue in the civil case);

United States v. Rico Indus., Inc., 854 F.2d 710, 715 (5th Cir.

1988) (similar), cert. denied, 489 U.S. 1078 (1989). Because the

law will not tolerate privately negotiated end runs around the

criminal justice system, we reject appellant's claim that the

district court could no longer order him to make restitution. At

8By its terms, the settlement is restricted to claims by the
City arising out of "extortion by Louis Simon and Brian J.
Sarault." The agreement recites that appellant "denies . . .
liability and disputes the legal effect of the alleged events."
In turn, the City agrees that the settlement "is not to be
construed as an admission of responsibility on the part of Paul
Savoie."

13

the same time and for the same reason, we reject appellant's

related claim that the settlement figure capped the amount of

restitution that could be ordered.

Appellant also contends that the settlement amount

should at least have been set off against the district court's

restitution figure. The statute itself dispatches this

contention. The VWPA contemplates setting off amounts already

paid under a restitution order against amounts later recovered in

civil proceedings. See 18 U.S.C. 3663(e)(2). There is no

mention of setoffs operating in the opposite direction. What is

more, the setoff provision is based upon actual payments rather

than promises to pay at some future date(s).

We have said enough. In the circumstances of this

case, appellant has failed to prove that the restitution order is

"with respect to a loss for which the victim has received or is

to receive compensation." 18 U.S.C. 3663(e)(1). The order may

stand.9

C. The Fine.

Appellant's next foray implicates the fine levied

against him. He asseverates that, in imposing the fine, the

district court shirked its statutory duty. Appellate courts

review the imposition of fines under the sentencing guidelines by

resort to an abuse-of-discretion rubric. See United States v.

9This is not to say, however, that appellant must pay the
piper twice. We see no reason why, in the circumstances of this
case, any payments made under the restitution order, so long as
destined for the City of Pawtucket, should not also be credited
against appellant's liability under the settlement agreement.

14

Rivera, 971 F.2d 876, 895 (2d Cir. 1992); United States v.

Washington-Williams, 945 F.2d 325, 326 (10th Cir. 1991). We

discern no abuse here.10

Following Congress's lead, see 18 U.S.C. 3553(b)

(1988), the sentencing guidelines provide that the district court

"shall impose a fine in all cases, except where the defendant

establishes that he is unable to pay and is unlikely to become

able to pay any fine." U.S.S.G. 5E1.2(a). We take this

language to mean exactly what it says: under the guidelines, a

fine is the rule and it is the defendant's burden to

demonstrate that his case is an exception. See United States v.

Hickey, 917 F.2d 901, 907 (6th Cir. 1990); United States v.

Perez, 871 F.2d 45, 48 (6th Cir.), cert. denied, 492 U.S. 910

(1989). Since appellant offered no significant evidence on the

"inability to pay" issue, there is no basis for setting aside the

$7,500 fine a fine pegged at the nadir of the applicable

guideline range for the offense of conviction.

Appellant's two related arguments are similarly

unavailing. First, the district court's failure to make express

findings in open court concerning appellant's financial condition

and prospects does not necessitate reversal. See, e.g., United

States v. Wilfred American Educ. Corp., 953 F.2d 717, 719-20 (1st

Cir. 1992) (interpreting similar language in predecessor statute

as neither requiring findings nor allowing an appellate tribunal

10Because the claim is meritless, we need not decide whether
appellant waived this issue by failing to raise it below in
sufficient detail.

15

to presume that a district court ignored relevant evidence in the

record); United States v. Pilgrim Market Corp., 944 F.2d 14, 22-

23 (1st Cir. 1991) (similar). Second, appellant's assault on the

viability of U.S.S.G. 5E1.2(i) (a guideline dealing with fines

imposed to cover the cost of imprisonment) is a red herring. The

record contains no indication that the district court imposed the

$7,500 fine pursuant to that provision.

D. Compliance with Fed. R. Crim. P. 32(c)(3)(D).

When a defendant alleges that a PSI Report contains an

identified inaccuracy, the district court must either make a

finding concerning the allegation or make a determination that no

finding is necessary because the matter will not be taken into

account at sentencing. See Fed. R. Crim. P. 32(c)(3)(D). The

court must also append a written record of any such findings or

determinations to the PSI Report. Id. This protocol serves the

dual purpose of protecting the defendant's due process rights and

supplying a clear record for future proceedings (say, appellate

review or consideration for parole). See, e.g., United States v.

Levy, 897 F.2d 596, 599 (1st Cir. 1990); United States v.

Gerante, 891 F.2d 364, 367 (1st Cir. 1989); United States v.

Bruckman, 874 F.2d 57, 63-64 (1st Cir. 1989). Accordingly, we

have insisted on strict compliance with the rule. See United

States v. Hanono-Surujun, 914 F.2d 15, 18 (1st Cir. 1990)

(collecting cases).

That we are firm in requiring compliance with Rule

32(c)(3)(D) does not mean, however, that we habitually ignore the

16

realities of particular situations or divorce our consideration

from the circumstances of actual cases. The opposite is true.

See, e.g., United States v. Santana-Camacho, 931 F.2d 966, 969-70

(1st Cir. 1991); Levy, 897 F.2d at 598-99; Bruckman, 874 F.2d at

64-66; United States v. Serino, 835 F.2d 924, 932 (1st Cir.

1987). Thus, the record in a given case may show that the court

has "ma[d]e 'implicit' findings on disputed factual questions by

accepting the government's recommendations at the sentencing

hearing." United States v. Wells Metal Finishing, Inc., 922 F.2d

54, 58 (1st Cir. 1991).

The circumstances here are analogous to those that

confronted the Wells court. The judge presented both the

prosecutor and defense counsel with an opportunity to voice their

concerns anent the contents of the PSI Report. He heard

arguments from both sides about disputed matters. After

argument, the judge accepted the government's sentencing

recommendations and then indicated in writing, as part of the

judgment, that he had "adopt[ed] the factual findings . . . in

the presentence report." We think that this writing is

tantamount to the slightly more elaborate notation made by the

judge in Wells, 922 F.2d at 58, and that the purposes of Rule 32

were equally served. The only logically inferable conclusion is

that the court rejected each and all of appellant's fact-based

challenges to the PSI Report. See id.; see also United States v.

Cruz, F.2d , (1st Cir. 1992) [No. 91-1047, slip op. at

17

12-15]; Gerante, 891 F.2d at 367; Bruckman, 874 F.2d at 64. In

short, the district court made adequately particularized

findings, and created a minimally sufficient written

memorialization of those findings, when it expressly adopted the

facts as limned in the PSI Report, thereby necessarily finding

against appellant on all disputed matters of fact. Fed. R. Crim.

P. 32(c)(3)(D) was not violated.

III. CONCLUSION

We need go no further.11 Although appellant parades

a battery of challenges before us, none pass muster. The

judgment below must, therefore, be

Affirmed.

11Appellant further hints, without providing any detail,
that the sentencing court may have failed to "state in open court
the reasons for its imposition of the particular sentence" as
required by 18 U.S.C. 3553(c) (1988). Read in conjunction with
the pointed comments delivered by the district court at
sentencing, this suggestion borders on the frivolous. At any
rate, we will not attempt to fathom what appellant may have in
mind, for it is our established rule that "issues adverted to in
a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived." United States v. Zannino, 895

F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990).

18